IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-243 |
| | ) | |
| JAMES W. JOHNSON | ) | |

**OMNIBUS RESPONSE TO PRETRIAL MOTIONS**

AND NOW comes the United States of America, through its counsel, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Brendan T. Conway, Assistant United States Attorney for said District, and respectfully submits its Omnibus Response to Pretrial Motions filed on behalf of, the defendant James W. Johnson ("Johnson").

I.      FACTUAL AND PROCEDURAL BACKGROUND

In December 2016, the Hazelwood section of Pittsburgh, Pennsylvania, had become a high-crime area due to gang retaliatory shootings and rampant drug dealing.  The police had received constant complaints from this area, including one related to 330 Renova Street (the "Residence").  On December 30, 2016, City of Pittsburgh Police Officer Robert Berberich ("Berberich") and his partner, Tariq Francis, conducted a patrol in the area of the Residence in an unmarked police car.  Berberich is an experienced officer with more than five years of experience and having conducted multiple narcotics and/or firearm-related arrests.

Berberich and Francis drove by the Residence and noticed that the door to the residence was closed and no one was on the porch.  The officers later observed a hand-to-hand transaction in which Johnson provided a then unknown substance to an individual later identified as James Mitchell ("Mitchell").  As Mitchell was returning to the vehicle in which he was a passenger, he held up a plastic bag of then suspected narcotics to show that driver the vehicle, Justin Devey

("Devey") that Mitchell had successfully purchased the narcotics.  Prior to the transaction, Johnson had exited from the porch of the Residence, and he returned to porch area after the transaction.

Berberich knew Johnson as a Hazelwood MOB gang member and a daily visitor to the Residence.  Berberich had seen Johnson come in and out of the front door of the Residence on many occasions, and Berberich knew that Johnson was related to the owner.

Based on his training and experience, Berberich immediately recognized the hand-to-hand transaction between Johnson and Mitchell as a drug transaction, and he was right.  A later stop of the vehicle occupied by Mitchell led to the recovery of the narcotics, and Mitchell admitted that he purchased the drugs from the Residence and he identified Johnson as the seller of the narcotics through a Facebook photograph.

A.  THE SEARCH WARRANT APPLICATION

Based on the information set forth above, Berberich applied for a search warrant of the Residence on January 1, 2017.  A Magisterial District Judge approved the warrant authorizing the search of the residence, which included the front port, and its curtilage, which included the front and rear yard.  There is no allegation of any misrepresentation or material omission from the search warrant affidavit. (See Document No. 41, Exhibit A).

In the affidavit in support of the search warrant, Berberich indicated that he intended to apply for a warrant for the defendant's arrest.  As arrest warrants are signed by Judges of the Court of Common Pleas, and not Magisterial District Judge, and because of the New Year holiday, Berberich was not able to get the arrest warrant approved until January 3, 2017, which was after the defendant's arrest.

B. THE JANUARY 2, 2017 EXECUTION OF THE SEARCH WARRANT AND THE
SEARCH OF THE DEFENDANT

With the assistance of Pittsburgh SWAT, the Pittsburgh Bureau of Police executed the

search warrant at the Residence on January 2, 2017.  There is some confusion as to exactly where

Johnson was when SWAT approached the house.  Berberich reported in a later Affidavit in support

of a search warrant for cellular telephone found on the defendant's person, that "Operator Mescan

observed [Johnson] run out of the residence via the front screen door." (Document 39, Exhibit A).

Mescan testified at a hearing, however, that he "witnessed a male come out of the front door, down

the stairs and onto the sidewalk." (Exhibit D, p. 23).[1]  When asked whether he saw the male open

the door from the residence and leave, Mescan responded, "I recall him being on the porch walking

down the stairs." (Id. at 24).  Mescan further testified that he, "alerted the team that [the male] was

leaving the residence and needed to be detained[.]" (Id. at 26).

In any event, when SWAT entered the Residence, they reported to Berberich that they

observed in plain view stamp bags of suspected heroin scattered on the kitchen floor of the

residence.  Those stamp bags had the same names as stamp bags sold by the defendant to Mitchell,

and the laboratory eventually determined that the bags contained fentanyl.  The defendant was the

only person seen by law enforcement on the porch area, and there was no one at the Residence at

the time of the execution of the warrant.

Law enforcement initially detained the defendant, and, after Berberich learned about what

was in the house, Berberich authorized the arrest of the defendant.  At that point, the officers

exchanged the zip ties used to ensure the safety of the officers for handcuffs.  A search incident to

his arrest led to the seizure of two cellular telephones, more than $900 in cash, and a key to the

Residence.

A search of the Residence revealed all sorts of evidence associated with drug trafficking, along with a letter sent from the defendant.  That evidence included fentanyl, crack cocaine, powdered cocaine, methamphetamine, baggies, a firearm, extended magazines, ammunition, holsters, a ballistic vest, a digital scale, a diluent, and other items associated with drug trafficking.

### C.  THE STATE SEARCH WARRANT FOR THE CELLULAR TELEPHONES

On January 18, 2017, Berberich applied for a warrant to search the cellular telephones seized from the defendant on January 2, 2017, and a Magisterial District Judge approved the warrant on the same day.  Berberich's affidavit related to the search of the cellular telephones was limited to the events of January 2, 2017, and the results of the execution of the search warrant at the Residence.  He outlined the various items related to drug trafficking found at the Residence, and he noted that law enforcement found the cellular telephones, cash, and a key to the residence, but the affidavit only makes clear that one of the cellular telephones and the key were found on the defendant's person.  In the affidavit, Berberich wrote, "Mescan observed the main target and known actor/Hazelwood Mob member (James Weldon Johnson) run out of the residence via the front screen door."  (See Document No. 39, Exhibit A).  Berberich also noted that no one else was found inside the residence, that he had observed Berberich coming in and out of the Residence on the daily basis, and that the defendant's mother owned the home.

### D.  THE FEDERAL SEARCH WARRANTS FOR THE CELLULAR TELEPHONES

The matter was eventually adopted for federal prosecution, and as part of the investigation, Special Agent James Fidler ("SA Fidler") applied for a search warrant for the two cellular telephones seized from the defendant's person, another cellular telephone found in the Residence during the search, and a tablet also found in the Residence during the search.  SA Fidler executed

---

[1] There were various hearing in the Court of Common Pleas before the case was adopted for federal prosecution.  The transcripts of those hearing are attached hereto as Exhibits A, B, C and D.

an affidavit in support of the search warrant on February 26, 2018, and the Honorable Cynthia R. Eddy approved the warrant on that same day. (See Exhibit E).

The statement of probable cause noted that a federal Grand Jury had indicted the defendant on charges of distribution of fentanyl, possession with the intent to distribute a quantity of cocaine base, a quantity of fentanyl, a quantity of cocaine hydrochloride, and a quantity of methamphetamine, and possession of a firearm by a convicted felon. The distribution of fentanyl count, as SA Fidler wrote in his affidavit, resulted when law enforcement officers observed the defendant conduct a hand-to-hand transaction from the Residence, and that officers recovered the stamp bags of fentanyl from the purchaser.

SA Fidler also described the search warrant at the Residence on January 2, 2017. He wrote that the defendant "was at the residence at the time, and he attempted to flee from the front door upon SWAT announcement of their presence via loud speaker. He was apprehended." (Exhibit E, ¶ 10). SA Fidler also set forth other observations of law enforcement, including that stamp bags containing fentanyl were strewn throughout the kitchen and rear doorway, and the recovery by law enforcement of drugs and evidence of packaging and distribution of controlled substances. SA Fidler also listed other items recovered, including a firearm, a ballistic vest, two holsters, and two extended .45 caliber magazines.

SA Fidler was unable to extract information from one of the cellular telephones because the then-existing technology could not allow law enforcement access to that information within the cellular telephone. Subsequent advances in the technology, however, made accessing the device feasible. As a result, on January 29, 2019, SA Fidler executed an affidavit in support of one of the cellular telephones – the white Apple I-Phone – using a virtually identical affidavit to the one originally used. (See Exhibit F). The searches of these cellular telephones have revealed

a treasure trove of evidence against the defendant and reveal his heavy involvement in drug trafficking.

II.    MOTION TO SUPPRESS STATE SEARCH WARRANT OF RESIDENCE (Document No. 41)

The defendant first seeks suppression of the proceeds of the search of the Residence.  To establish that the appropriate remedy is suppression, however, the defendant must first establish standing to object to the search of the residence.  The government does not concede that the defendant has standing and, therefore, the defendant must affirmatively demonstrate that he has standing to object to the search.

Assuming that the defendant is able to establish standing, the Court must then review the search warrant itself using a highly deferential standard that is Court articulated in United States v. Montgomery, 2018 WL 3621015 (W.D. Pa. July 30, 2018) as follows:

> In approving or denying an application for a search warrant, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  The legal standard for a district court judge reviewing the issuance of a search warrant is highly deferential; as the Supreme Court has explained and as this Court noted above, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.  A reviewing court may not conduct a de novo review of an issuing judge's probable cause determination.

(citations, internal quotations, and ellipses omitted).  Applying this standard to the facts of this case leads inexorably to the conclusion that the Court should conclude that the warrant is valid.

A.  THE STATE SEARCH WARRANT OF THE RESIDENCE SETS FORTH
     PROBABLE CAUSE

Berberich's affidavit in support of the search warrant of the residence set forth far more

evidence than necessary to justify the Magistrate Judge's decision to approve the warrant.  Among

the items of evidence were the following:

- The Residence in an high-crime area with "rampant" drug trafficking, including a
  complaint involving the Residence;

- Berberich observed the defendant engaged in a hand-to-hand transaction with a
  person later identified as Mitchell that Berberich, based on his training and
  experience, recognized as a drug transaction;

- The transaction occurred right outside of the Residence and the defendant came
  from the porch area of the residence and returned to the porch area after the
  transaction;

- As Mitchell returned to his vehicle after meeting with the defendant, he held up a
  plastic bag that Berberich recognized as bundles of heroin;

- Berberich knew that the defendant frequented this address on a daily basis, and he
  had seen the defendant frequently come in and out of the front door of the residence;

- The defendant was related to the owner of the residence;

- The defendant is a Hazelwood Mob gang member;

- Berberich confirmed that the defendant sold Mitchell drugs through a search of the
  vehicle Mitchell occupied, which revealed the drugs, and based on the interview of
  Mitchell who confirmed that he purchased drugs; and

- Mitchell was able to identify the defendant as the person who sold him drugs
  outside of the Residence through the defendant's Facebook page.

In summary, this evidence establishes probable cause to believe that the defendant was selling

drugs out of the Residence and it is reasonable to infer that evidence of the defendant's drug

trafficking activity would be located in the Residence.

The defendant's arguments for suppression rely on the Court simply ignoring the

compelling evidence of the defendant's drug trafficking activity, and any reasonable inferences

from that evidence.  For example, the defendant contends that, "an objective reading of the affidavit fails to sufficiently establish that Mr. Johnson actually engaged in the sale or distribution of narcotics." (Document 40, p. 1).  The defendant could not be more wrong.  An experienced police officer personally observed what he believed was a hand-to-hand drug transaction, and that officer further observed the purchaser of the drugs holding up a baggie containing bundles of heroin after meeting with and engaging in a hand-to-hand transaction with the defendant.  A later search of the purchaser's vehicle revealed the drugs, and the purchaser told the affiant that he just bought the drugs outside of the Residence and identified Johnson, through a photograph, as the seller.  Thus, contrary to the defendant's contention, there was compelling evidence that the defendant was selling drugs out of the residence.

### B.  THE GOOD FAITH EXCEPTION APPLIES

Even if the Court were to somehow conclude that Berberich's affidavit failed to set forth adequate evidence to justify the search warrant, the Court should still not suppress the evidence because of the "good faith" exception.  In United States v. Burnett, 2019 WL 109333, at *4 (W.D. Pa. Jan. 4, 2019), the Honorable Nora Barry Fischer recently set forth the relevant inquiry as follows:

> The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge.  The purpose of the exclusionary rule-to deter police misconduct—would not be furthered by suppressing evidence obtained during a search when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.  The question is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.  Indeed, the mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.  The United States

> Court of Appeals for the Third Circuit has recognized that the good
> faith exception does not apply in four limited circumstances:
>
> > 1) where the magistrate judge issued the warrant in reliance
> > on a deliberately or recklessly false affidavit;
> >
> > 2) where the magistrate judge abandoned his or her judicial
> > role and failed to perform his or her neutral and detached function;
> >
> > 3) where the warrant was based on an affidavit so lacking in
> > indicia of probable cause as to render official belief in its existence
> > entirely unreasonable; or
> >
> > 4) where the warrant was so facially deficient that it failed to
> > particularize the place to be searched or the things to be seized.
> >
> > These limited exceptions involve conduct that is deliberate, reckless,
> > or grossly negligent.

(citations, internal quotations, and ellipses omitted).

In this case, with respect to this warrant, there is no cogent argument that any of the exceptions outlined above apply.  The only exception the defendant even attempts to argue is that the warrant was so lacking in probable cause that no reasonable officer could conclude that there was probable cause.  For the reasons articulated above, however, Berberich outlined compelling evidence that the defendant was engaged in drug trafficking through his own personal observation and confirmed through witness testimony.  Thus, the good faith exception applies and the Court should not exclude the evidence.

III.    MOTION TO SUPPRESS SEARCH INCIDENT TO ARREST (Document No. 42)

As set forth above, when executing the search warrant, Berberich had applied for, but he had not yet received an approved warrant for the defendant's arrest.  Court of Common Pleas Judge Jeffrey Manning did not approve that warrant until the next day.  When SWAT arrived, the defendant was either on the porch area or inside the home and he was initially detained after he left the porch area and reached the sidewalk outside of the Residence.  After Berberich found out that drugs were found inside of the residence, he authorized the formal arrest of the defendant.  A search incident to that arrest revealed approximately $900 in cash, two cellular telephones, and a

key to the Residence.  The defendant seeks suppression of the evidence gathered during the search of the defendant,

### A.  LAW ENFORCEMENT PROPERLY DETAINED THE DEFENDANT

The officers had the authority to detain the defendant both pursuant to the search warrant and because the officers had reasonable suspicion to believe that the defendant had engaged in criminal conduct. Michigan v. Summers, 452 U.S. 692, 702, n. 16 (1981) ("We do not view the fact that respondent was leaving his house when the officers arrived to be of constitutional significance.  The seizure of respondent on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside."); Terry v. Ohio, 392 U.S. 1 (1968).  Law enforcement was not required to allow the defendant to flee the scene of the search, and they acted well within established legal precedent in detaining the defendant temporary pending the outcome of the search.

### B.  LAW ENFORCEMENT PROPERLY SEARCH THE DEFENDANT INCIDENT TO ARREST

Even if law enforcement was not permitted to detain the defendant pursuant to the search warrant, they had the authority to arrest the defendant immediately upon arriving at the residence based on the evidence of the sale of drugs to Mitchell outlined above.  In fact, Judge Manning, on the day after that search warrant, affirmed the probable cause finding by authorizing the arrest of the defendant.  Moreover, shortly after beginning the execution of the search warrant, Berberich had probable cause to arrest the defendant because the search revealed stamp bags of then suspected heroin located in the kitchen area of the home.  Thus, law enforcement properly searched the defendant incident to his valid arrest based on probable cause.  This Court articulated the standard the Court should employ in this analysis in United States v. Cabrera, 2014 WL 550006 (W.D. Pa. Feb. 11, 2014) as follows:

> Under the exclusionary rule, the Fourth Amendment bars the prosecution from introducing evidence obtained through an illegal search or seizure. The Fourth Amendment shields individuals from unreasonable searches. Searches conducted without a warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. One such exception is a search incident to a lawful arrest. Warrantless arrests must be based on probable cause. Probable cause entails that at the time of arrest, the facts and circumstances within the knowledge of the arresting agents, and of which they have reasonably trustworthy information, are sufficient to warrant a prudent individual in believing that the arrestee committed or is committing an offense. The probable cause inquiry requires a totality-of-the circumstances analysis as to whether a fair probability existed that a crime was or was being committed by the arrestee.

(citations and internal quotations omitted).

Even before law enforcement began to execute the search warrant at the Residence, Berberich had probable cause to arrest the defendant for the same reason had he probable cause to search the residence. Obviously, the preliminary results of the search provided even further evidence of the defendant's violation of the law. Thus, because Berberich had probable cause to arrest the defendant, the search of the defendant's person was lawful, and the Court should deny the motion.

## C. THE EVIDENCE IS ADMISSIBLE UNDER THE INEVITABLE DISCOVERY DOCTRINE

Even if the Court were to somehow conclude that Berberich lacked probable cause to arrest the defendant at the time of the search of his person, the Court should nonetheless deny the motion to suppress because, by the conclusion of the search warrant of the Residence, there was certainly more than sufficient evidence to support a finding of probable cause to justify the arrest of the defendant. Thus, whether at the time of the search or at a later time, it was inevitable that Berberich was going to arrest the defendant and that law enforcement would search him incident to that arrest

and, therefore, the Court should deny the motion to suppress. See United States v. McMillan, 227 F. Supp. 3d 432, 443 (W.D. Pa. 2017).

IV.     MOTION TO SUPPRESS STATE SEARCH WARRANT OF CELLULAR TELEPHONES (Document No. 40)

As set forth above, on January 18, 2017, Berberich applied for search warrants for the two cellular telephones seized from the defendant incident to his lawful arrest. (Document No. 39, Exhibit A).  The defendant seeks suppression of the fruits of these searches claiming that Berberich made materially false statements in his affidavit either intentionally or with reckless disregard for the truth of those statements.  The defendant also accused Berberich of making material omissions that he claims were also done intentionally or with reckless disregard for the truth.  Finally, defendant agues, "as a tertiary matter" that the affidavit lacks a sufficient probable cause to justify the issuance of a search warrant because there is no direct evidence that the defendant used the cellular telephones in his drug trafficking business.  Addressing these arguments requires application of different legal standards, but, in any event, proper application of those legal standards inexorably leads to the denial of the motion.

A.  THE WARRANT SETS FORTH PROBABLE CAUSE

As for the defendant's argument that the affidavit lacks sufficient probable cause because it fails to detail any direct evidence of the defendant's use of cellular telephones in his drug trafficking business, the highly deferential legal standard that the Court must apply in analyzing that argument is set forth above.

While it is true that Berberich's affidavit does not include any evidence that the defendant used cellular telephones in his drug trafficking activities, the Affidavit does include the following statement, which the defendant does not dispute as accurate:

> Based on my combined training, education, and experience, your affiant is aware that cell phones are often used in furtherance of street level narcotics transactions.  Your affiant is aware that cell phones have become a crucial tool in the drug trade.  Cell phones are commonly used both by narcotic sellers as well as narcotic users for the purposes of arranging narcotics transactions.

That statement provides the basis for believing that evidence of the defendant's drug trafficking would be found on the cellular telephones found in his possession.

The defendant seems to contend that absent some sort of direct evidence that the defendant used cellular telephones in his drug trafficking business, no magistrate could reasonably conclude that there was probable cause to believe that evidence of the defendant's drug trafficking would be located on those cellular telephones.  That contention provides a much higher burden then required.  Even if this Court were conducting a de novo review, which it should not, the Court should conclude that Berberich's statement quoted above – which merely states what is common knowledge – is sufficient, along with the other evidence outlined in the warrant, to demonstrate probable cause to believe that a search of the cellular telephones would reveal evidence of the defendant's drug dealing activities.  In today's world, it is difficult to conduct any type of business without cellular telephones; they have become ubiquitous.  Moreover, they are increasingly powerful and useful.  It naturally flows from those facts and the drug trafficking business that evidence of the defendant's drug trafficking business would be located on the cellular telephone, and, in fact, there was extensive evidence of the defendant's drug trafficking on those telephones.  Thus, the Court should conclude that the magistrate had a substantial basis for concluding that probable cause existed and deny the motion to suppress to the extent the motion is based on a contrary argument.

## B.  THE GOOD FAITH EXCEPTION APPLIES

As set forth above, where, as in this case, Berberich has obtained a facially valid warrant, the good faith exception precludes exclusion of any of the evidence obtained from that search warrant.  Thus, the good faith exception provides an alternative bases for denying the motion to suppress.

### C.  THE DEFENDANT HAS NOT MET THE *DELAWARE V. FRANKS* STANDARD AND IS NOT ENTITLED TO A HEARING

As for the state search warrant of the cellular telephones, the defendant argues that the warrant contains material misrepresentations and omissions.  The defendant's request for a hearing under Franks v. Delaware, 438 U.S. 154 (1978), to challenge the content of the search warrant affidavit can only be granted if he makes a substantial preliminary showing of the following two conditions:  (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) the allegedly false statement is necessary to the finding of probable cause.  Franks, 438 U.S. at 155–56; United States v. Brown, 3 F.3d 673, 673, 676 (3d Cir. 1993).

A Franks hearing is not an opportunity to assess the overall veracity or performance of an affiant through hindsight.  To the contrary, such a hearing should only occur if a defendant sufficiently demonstrates in advance not only that false information was included in the affidavit, but also that such false information was knowingly or recklessly included, and the false information was necessary to a finding of probable cause.  Franks, 438 U.S. at 155–56; Brown, 3 F.3d at 673; United States v. Yusuf, 461 F.3d 374, 378 (3d Cir. 2006) (finding that the District Court erred by failing to recognize that government agents should generally be able to presume that information received from a sister governmental agency is accurate).

In Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth standards to identify what constitutes "reckless disregard for the truth" regarding both misstatements and omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

Id. at 783. The latter standard is similar to the actual malice standard set forth in First Amendment defamation claims. Id. at 788.

Moreover, if the false information was not necessary to a finding of probable cause or if there is still probable cause when the omitted information is added, no hearing should occur, and no evidence should be suppressed even if the affiant deliberately included or excluded it.  Thus, in the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding.  The Court of Appeals recognizes a distinction between misrepresentations and omissions for purposes of determining whether deficiencies in the affidavit are "material." When faced with an affirmative misrepresentation, the court excises the false statement from the affidavit, but with an omission, the court must supply the omitted information to the original affidavit. United States v. Yusuf, 461 F.3d 374, 383–84 (3d Cir. 2006); United States v. Shields, 458 F.3d 269, 276 (3d Cir. 2006); Brown, 3 F.3d at 676.

Such a high standard has been set not because mendacity or sloppiness is acceptable, but because (1) there is a presumption of validity with respect to search warrant affidavits, (2) there is a clear need to avoid the use of pretrial hearings for discovery purposes, and (3) no cognizable

Fourth Amendment interest is served if deletion of the allegedly false information would not likewise delete probable cause. Franks, 438 U.S. at 171–72. Additionally, in the affidavit-drafting context, the Supreme Court has recognized a distinction between truthful information and accurate information, and has defined truthful information as information that may have been incorrect but was "believed or appropriately accepted by the affiant" at the time of drafting. Franks, 438 U.S. at 165.

Courts also recognize the hurried manner in which search warrants are often prepared, particularly in the reactive crime context such as narcotics trafficking. Search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 108 (1965); see also Illinois v. Gates, 462 U.S. 213, 235 (1983). See also United States v. Richardson, 2018 WL 4043155 (W.D. Pa. Aug. 24, 2018).

The defendant's first step in attempting to get a hearing is to enumerate the alleged false statements or material omission. The first alleged misrepresentation is Berberich statements that, Officer Mercan observed the defendant run out of the residence via the front screen door. As the defendant points out, Berberich testified consistent with that statement at a later hearing. Mercan also provided testimony consistent with that representation, and that he relayed that information to other officers. Later, however, Mercan testified that he observed the defendant on the porch and not inside the structure. Mercan considered the porch part of the structure. Another Officer, Robert Engelhardt, also testified that he observed the defendant leaving the house but he later clarified that by leaving the house, he meant leaving the porch area of the house. Thus, what appears to have happened is that officers observed the defendant leaving the porch area of the Residence and relayed information to Berberich that he interpreted as the defendant leaving the

inside of the home.  In any event, whether the defendant left the porch area or the Residence is of no real significance, particularly given the time of year, which was in the middle of winter.  Any reasonable fact finder would concluded from the defendant's access to the porch that he also had access to the residence given the time of year and other evidence of his access to the Residence outlined in the Affidavit.  In any event, any court would be hard-pressed to make a finding that the statement was false, much less that Berberich made the purportedly falsely statement intentionally or with reckless disregard for the truth. the statement in the context of Sergeant Newcomer's testimony, the Court is hard-pressed to make a finding that the statement was false, much less that Sergeant Newcomer made the "false" statement intentionally or with reckless disregard for the truth. See United States v. Veasley, 2012 WL 3245492, at *5 (W.D. Pa. Aug. 8, 2012).

The second point raised by the defendant is that Berberich reported in the affidavit that the defendant was a member of the Hazelwood Mob gang, which the defendant does not deny was truthful information.  The defendant claims, however, that Berberich last received information that the defendant was a member of the Hazelwood Mob gang in 2011, but that is misreading the testimony quoted of Berberich quoted by the defendant.  Berberich's actual testimony was that he knew that the defendant was a Hazelwood Mob gang member since 2011, when Berberich worked in Zone 4.  Never in his testimony did Berberich testify that the last time he received information about the defendant's associated with the Hazelwood was in 2011.  In fact, Berberich only admitted that the last knowledge of the defendant's association with the Hazelwood Mob gang may not have been in 2016.  Thus, the record cited by the defendant does not support his assertion that the information about the defendant's gang membership was six years old, but rather that it was a year old.  Thus, Bererich's statement that the defendant was a Hazelwood Mob gang was accurate.

Finally, the defendant suggests that Beberich's affidavit is misleading with regard to the evidence connecting the defendant to the Residence.  Specifically, the defendant contends that when Berberich wrote "indicia (upstairs bedroom)", he should have made it clear that most of the indicia reported in the affidavit related to Tanya Johnson and not the defendant.  Later in the Affidavit, however, Berberich wrote, "Officers observed hundreds of pieces of indicia inside of this residence for Tanya Johnson."  Thus, Berberich did inform the Magistrate not only that Tanya Johnson was the owner the property, but that there were hundreds of pieces of indicia for her found at the residence.

The overall gist of the defendant's motion is that if Berberich had provided more accurate and complete information, there would have insufficient evidence to connect sufficiently the defendant to the Residence to justify, along with the other evidence against the defendant, the issuance of a warrant for the cellular telephones found on his person.  As part of that analysis, the Court should look to the undisputed evidence that evidence of the defendant's drug dealing activities would be found in the cellular telephones found on his person at the time of his arrest. First, in terms of evidence linking the defendant to the Residence and thus the treasure trove of evidence of drug trafficking inside of the Residence, the undisputed evidence includes the following:

- SWAT officers arrested the defendant outside of the Residence after leaving the porch area of the Residence;

- The Residence is owned by the defendant's mother;

- The defendant had a key to the Residence located in his pockets when he was arrested:

- No one was inside the Residence at the time of the search;

- Stamp bags found in the residence matched the stamps bags associated with another incident involving the defendant;

- Berberich had observed the defendant going in and out of the Residence on the daily basis; and

- The Residence was released to the defendant's father after it was cleared.

Based on all of the above, there was more than sufficient evidence linking the defendant to the Residence and the treasure trove of drug trafficking evidence located within the residence to conclude that there was probable cause to search the cellular telephone found on the defendant's person at the time of his arrest.  In addition, there is no dispute that, at least at one time, the defendant was a Hazelwood Mob gang member and that he had more than $900 on his person at the time of his arrest.  As there is more than sufficient evidence, even when the defendant's complaints about the warrant are accounted for, to support a finding of probable cause to search the defendant's cellular telephones, the Court should deny the defendant's motion without a hearing.

Court have routinely denied motions in cases in which the evidence supporting a probable cause finding was much less compelling than in this case. See e.g. United States v. Livingston, 445 F. App'x 550, 556 (3d Cir. 2011); United States v. Brooks, 2018 WL 6582810, at *28 (W.D. Pa. Dec. 14, 2018); United States v. Lawrence, 2015 WL 9027037, at *7 (W.D. Pa. Dec. 15, 2015); United States v. Veasley, 2012 WL 3245492, *6 (W.D. Pa. Aug. 8, 2012) (holding that "the totality of the circumstances reflected in the corrected affidavit readily demonstrates probable cause.")

Additionally, the defendant has offered no explanation as to how Berberich's inclusion of the supposedly false information and exclusion of the omitted information was done intentionally or with reckless disregard for the truth.  The record already includes reasonable explanations for the inclusions and omissions, and the defendant has failed to suggest how these explanations are

not reasonable. (See Exhibits A-D).  Thus, the defendant has fialed to meet his heavy burden justifying a hearing on his motion and the Court should deny the motion without a hearing.

V.      MOTION TO SUPPRESS FEDERAL SEARCH WARRANTS OF ELECTRONIC DEVICES (Document No.  39)

As set forth above, on February 26, 2018, SA Fidler applied for search warrants on the two cellular telephones seized from the defendant incident to his lawful arrest, a cellular telephone found in the residence, and a tablet found in the residence. (Exhibit E).  Because of technical issues getting access to the data in one of the cellular telephones, SA Fidler applied for a second search warrant for the I-Phone seized from the defendant incident to his lawful arrest on January 29, 2019. (Exhibit F).  In both of those warrants, SA Fidler correctly reported that a federal grand jury had returned an Indictment against the defendant charging him with violation of federal drug trafficking and firearms laws.  Thus, there was already, even prior to the submission of the search warrant, a finding of probable cause by the grand jury.  The defendant seeks suppression of the fruits of these searches authorized by these warrants by making essentially the same argument he made in support of the suppression of the state search warrant of the cellular telephones.

The defendant contends that the warrants lack probable cause because the affidavits in support of the warrants do not articulate direct evidence that the defendant used the electronic devices in connection with his drug dealing activity.  As with the Berberich cellular telephone affidavit, SA Fidler's affidavits contain similar language of drug traffickers' use of cellular telephones in connection with their drug dealing activities and why evidence of their activities would be on the electronic devices.  Thus, even absent direct evidence of the defendant's use of these devices, SA Fidler articulated evidence in support of the Magistrate Judge's probable cause finding.  Moreover, as is also outlined above, the good faith exception applies with regard to this particular argument, which would also preclude suppression.

The defendant further contends, like with Berberich and the state cellular telephone search warrants, that SA Fidler, intentionally or with reckless disregard of the truth, made material misrepresentations or omitted material information.  The defendant further contends that if these misrepresentations were excluded and the omitted information included, there is not sufficient probable cause contained in the affidavits to justify the issuance of a search warrant.

The supposed false information is that the defendant, when SWAT approached the Residence, the defendant was located on the porch area, as opposed to inside of the home.  Whether the defendant came from inside the residence or from the porch area has no significance in the probable cause finding, particularly because the search occurred on January 2, 2017, which is in the middle of winter.  Any reasonable fact finder would conclude that the defendant was not simply hanging out on the porch in the middle of winter, but that he was accessing the Residence.

Additionally, SA Fidler reported that the defendant conducted a hand-to-hand drug transaction "from" the Residence on December 30, 2016, when the transaction took place on the sidewalk in front of the Residence after the defendant left the porch area of the Residence.  To the extent that there is any difference between "from" the Residence and at the sidewalk of the Residence after the defendant left the porch area of the Residence, it is miniscule difference with no significance in the probable cause finding, particularly given the time of year.  The statement was not false and certainly was not made intentionally or with reckless disregard of the truth.

In terms of omissions from the warrant, the defendant contends that SA Fidler failed to include in his affidavit that the police identified another individual, Whitney Fennell, in the vicinity of the Residence at the time of the search and that indicia from Fennell was located within the Residence.  The defendant provided no evidence that Fennell was a suspect or that he was responsible for the treasure trove of drug distribution evidence located in the Residence.  As SA

Fidler noted, it was the defendant, and not Fennell, who was selling drugs outside of the Residence on December 30, 2016, three days before the execution of the warrant.  It was the defendant, and not Fennell, who was seen leaving the porch area of the home after SWAT announced their presence.  It was the defendant, and not Fennell, who had been indicted by a grand jury.  Under these circumstances, the United States Magistrate Judge would not necessarily want to know that there was another individual located in the proximity of the home, particularly when there is no evidence that the individual was involved in drug trafficking and direct and substantial evidence that the defendant was involved in drug trafficking.

The overall gist of the defendant's motion is that if Berberich had provided more accurate and complete information, there would have insufficient evidence to connect sufficiently the defendant to the Residence to justify, along with the other evidence against the defendant, the issuance of a warrant for the electronic devices found during the search.  As part of that analysis, the Court should look to the undisputed evidence of the defendant's drug dealing activities and the evidence that evidence of those activities would be found in the electronic devices found during the search.  First, in terms of evidence linking the defendant to the Residence and thus the treasure trove of evidence of drug trafficking inside of the Residence, the undisputed evidence, as amended by the defendant's motion, includes the following:

- A federal grand jury had returned an Indictment against the defendant, finding probable cause to believe that he had violated federal drug trafficking and firearms laws on December 30, 2016 and January 2, 2017;

- On December 30, 2016, officers from the Pittsburgh Bureau of Police observed the defendant conduct a hand-to-hand transaction in the vicinity of the Residence, and the police recovered the drugs, which turned out to be Fentanyl, from the individual who purchased the drugs from the defendant; and

- SWAT officers arrested the defendant outside of the Residence after leaving the porch area of the Residence;

- There was a letter addressed from the defendant located within the Residence; and

- Another individual was observed in proximity to the Residence and indicia for Fennell was located within the Residence.

Based on all of the above, there was more than sufficient evidence of the defendant's criminal activities and linking the defendant to the Residence and the treasure trove of drug trafficking evidence located within the residence, to conclude that there was probable cause to search the electronic devices seized during the search.  Particularly compelling, of course, is that the grand jury had already determined that there was probable cause to believe that the defendant had violated federal drug trafficking and firearm laws.  Thus, the Court should deny the motion without a hearing.

VI.     MOTION TO PRODUCE (Document No. 36)

The defendant seeks a Court order requiring the government to provide the defense with notice of its intention to seek admission of evidence pursuant to Federal Rules of Evidence 404(b) and 609.  Federal Rule of Evidence 404(b), provides that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any . . . evidence [of other crimes, wrongs, or acts] it intends to introduce at trial."  Fed. R. Evid. 404(b).  The government has provided notice to the defendant of its intent to admit the results of searches of cellular telephones, which include communications related to drug trafficking and, potentially, firearms as well.  Of particular interest are the defendant's communications in which he is selling fentanyl stamp bags marked as "Trumps", which are the same stamp bags he sold to Mitchell and the same stamp bags seized from the Residence.  Obviously, the government intends to seek admission of all of these communications as direct evidence of the defendant's intent to distribute, as opposed to use personally, the stamp bags found in the Residence.  The

government is still reviewing the cellular telephones to determine what other evidence it intends to submit, but the government has provided the cellular telephones downloads to the defense.  In any event, if the Court provides a deadline for submitting a Rule 404(b) notice several weeks prior to trial, that will be sufficient notice to the defendant, particularly in light of the disclosure about and the defendant's access to the cellular telephone downloads.

As for Federal Rule of Evidence 609, the only provision that requires notice is Rule 609(b), which provides that a party seeking admission of a conviction must provide written notice "if more than ten years have passed since the witness's conviction or release from confinement for it, whichever is later."  In terms of the defense witnesses, the government does not know the defense witnesses and whether they have prior convictions that would require written notification.  Once the defendant informs the government of his witnesses, the government will provide the required notice, if applicable.  As to the defendant, the government reserves the ability to cross-examine the defendant about all of his prior convictions based on the notice provided through this pleading.  Those convictions include all of the convictions listed in the criminal history provided to the defendant, which include felony drug trafficking convictions, illegal possession of firearms convictions, and an identity-theft conviction.

VII.   MOTION FOR DISCOVERY (Document No. 37)

The defendant filed a motion for discovery, which seems designed to preserve the defendant's rights.  To the best of counsel's government's knowledge the government has fully complied with its discovery obligations, and it will continue to comply fully with its discovery violations.

A.  RULE 16 – STATEMENTS OF THE DEFENDANT

Federal Rule of Criminal Procedure 16(a)(1)(A) and (a)(1)(B) requires that the government produce statements of the defendant made to individuals that the defendant then knew to be law enforcement.  In this case, counsel for the government is not aware of any statements that fall into that category.  Despite the specificity of Rule 16, the defendant seeks, without citation to any persuasive authority, a vast expansion of that Rule to include any statements that the defendant made to anyone.  The Court should deny that motion as that type of expansive discovery is not contemplated by the Federal Rules of Criminal Procedure.

B.  EXCULPATORY EVIDENCE

Under Brady v. Maryland, and its progeny, the government has the obligation to disclose exculpatory evidence—evidence that is favorable and material to the defense.  Strictly speaking, Brady "'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (citation omitted).  Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence.  If the exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it will be held to be material.  Id. at 260 (citations omitted).  See also United States v. Bagley, 473 U.S. 667, 682 (1985) (Evidence is "material" when it is reasonably probable that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different.").  Brady material must be disclosed "in time for its effective use at trial."  United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983), cert. denied, 464 U.S. 1048 (1984).  Accord United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988).

25

The Jencks Act, 18 U.S.C. § 3500, requires the government to provide the defense with statements of witnesses that it intends to call at trial.  The Jencks Act protects discovery of such witnesses' statements, however, "until said witness has testified on direct examination in the trial of the case."  18 U.S.C. § 3500(a).  See also United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994); United States v. Campagnuolo, 592 F.2d 852, 858 (5th Cir. 1979); United States v. Horsley, 621 F. Supp. 1060, 1067-68 (W.D. Pa. 1985), aff'd, 831 F.2d 286, 288 (3d Cir. 1987); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1393 (W.D. Pa. 1983).  The Third Circuit has held that a defendant's right to a fair trial is "fully protected" if material relating to the credibility of government witnesses is disclosed "the day that the witness testifies."  Higgs, 713 F.2d at 44.  The government acknowledges, however, that a strict adherence to the dictates of the Jencks Act could cause delays at trial.  Therefore, the government will voluntarily turn over Jencks Act materials well in advance of trial to ensure that unnecessary interruptions or delays are avoided.  In fact, the government has already largely complied with its Jencks Act responsibilities by providing the relevant reports and the affidavits in support of search warrants.

The defense seeks exculpatory materials, which primarily comes in two forms.  The first category is evidence tending to indicate that the defendant is not guilty of the offenses in the Indictment.  The second category is evidence useful in cross-examining government's witness, such as plea agreements, payments to informants, and similar types of information.

The government is not aware of any such evidence that has not already been disclosed that would tend to demonstrate that the defendant was not guilty of the offenses charged in the Indictment.  Obviously, as the government already disclosed, the defendant was not the only person with access to the Residence.  Law enforcement officers found Whitney Fennell near the residence at the time of the search and there was indicia for Fennell found in the Residence.  Thus,

the government anticipates that the defendant will attempt to contend that Fennell or some other person was responsible for the drugs and gun found in the Residence.  The government has provided the defendant the information related to Fennell in terms of the indicia and his presence near the Residence at the time of the execution of the warrant, and it will continue to provide the defendant with any information about other individuals who had access to the Residence.

Defendant's motion seeks disclosure of a wide variety of information.  The focus of many of the requests pertains to information about the government's anticipated trial witnesses.  The government intends to provide the majority of that information—to the extent that it exists—at the time that the government discloses the Jencks Act materials.  To the extent that defendants seek an earlier disclosure of this "impeachment" information, the government objects.

The Jencks Act, 18 U.S.C. § 3500, was enacted to set limits on pretrial discovery of witness statements in criminal cases, and, hence, reflects a legislative determination that a criminal defendant is entitled to use such statements for impeachment purposes in cross-examination, rather than in pretrial preparation.  See Palermo v. United States, 360 U.S. 343, 359 (1959); United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978).  The United States Supreme Court and the Court of Appeals for the Third Circuit both have confirmed that Jencks Act material need not be produced until after the witness testifies at trial.  Palermo, 360 U.S. at 349; United States v. Starusko, 729 F.2d at 263; Murphy, 569 F.2d at 773; United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972). Moreover, the Third Circuit has repeatedly held that a district court cannot compel the government to disclose statements of its witnesses before the conclusion of their direct examination, and that ordering early disclosure of such information constitutes an abuse of discretion or even reversible error.  United States v. Higgs, 713 F.2d at 44-45; Murphy, 596 F.2d at 773; Kenny, 462 F.2d at 1212; United States v. Scolnick, 392 F.2d 320, 327 (3d Cir. 1968).

27

Despite the plain language of the statute and judicial authorities, defendants in federal criminal proceedings repeatedly request early disclosure of "impeachment" material pertaining to the government's witnesses, relying on Brady v. Maryland and the pretext that the granting of the motion accords with judicial efficiency and economy and preserves defendants' due process rights. In reality, defendants are seeking to have the United States identify its witnesses and provide a witness list in advance of trial.  It is well established, however, that "the [criminal] discovery rules do not permit the defense to get the names of witnesses."  United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir. 1977).  Accord United States v. Casseus, 282 F.3d 253, 254, 257 (3d Cir. 2002) (affirming district court's refusal to order pretrial discovery of the government's witness list; "a criminal defendant does not have the right to full discovery of the government's case"); United States v. Addonizio, 451 F.2d 49, 62 (3d Cir. 1972) ("in no event is the government required to divulge the identity of its witnesses in a noncapital case").  See also United States v. DiPasquale, 740 F.2d 1282, 1294 (3d Cir. 1984); Government of the Virgin Islands v. Ventura, 476 F.2d 780, 781 n.1 (3d Cir. 1973).

It is equally well-settled that disclosure of evidence that may be used to discredit government witnesses is not directly exculpatory as to a defendant's substantive guilt, and need not be disclosed in advance of trial.  As noted above, the Third Circuit held in United States v. Higgs that disclosure of witness credibility evidence at the time of trial sufficiently ensures a defendant's right to a fair trial.  713 F.2d at 44.  Accordingly, pursuant to the foregoing legal authority, the government will provide impeachment material relating to its trial witnesses at the time that it discloses its Jencks Act materials for the witnesses.

Although not entirely clear, one could read the defendant's motion as requesting opinions by counsel for the government or law enforcement officers about the credibility of witnesses.  The

defendant, however, is not entitled to that information and the government does not intend to produce that information.  First, defendant provides no reason to believe that such assessments would be admissible or useful at trial.  Subjective opinions about the credibility of other witnesses is the exclusive province of the jury and typically inadmissible at trial.  Second, the type of evidence in this case—subjective opinions about the credibility of witnesses—is not the type of evidence required to be disclosed, where, as in this case, the underlying facts supporting any reasons for the opinions (i.e., plea agreement, inconsistent statements, drug addictions, etc.) will be disclosed.

One case seems to suggest, without holding, that when an agent or prosecutor actually writes down a negative credibility assessment, those writings are discoverable, but if they are communicated orally and no record of them is made, there is no requirement to produce them. United States v. Taylor, 471 F. App'x. 499 (6th Cir. 2012) (rejecting claim that government violated Brady by not disclosing AUSA's un-memorialized negative opinion of DEA agent formed in earlier and unrelated case).  The same case, however, suggests that unsubstantiated allegations that a witness lied are not discoverable, even if memorialized.  In a Third Circuit case, the Court rejected a claim that the government violated Brady by failing to disclose the prosecutor's belief that the agent committed perjury.  United States v. Donahue, 460 F. Appx. 141 (3d Cir. 2012).

In United States v. Kohring, 637 F.3d 895 (9th Cir. 2011), the Court seems to permit non-disclosure of government opinions about evidence, as long as, like here, the underlying facts are disclosed.  See also Morris v. Y1st, 447 F.3d 735, 742 (9th Cir. 2006) (holding that a prosecutor's opinions and mental impressions are not discoverable under Brady unless they contain otherwise undisclosed underlying exculpatory facts); Johnson v. United States, 860 F. Supp. 2d 663 (N.D. Iowa 2012) (same); United States v. Rigmaiden, 2010 WL 3463723 (D. Ariz. 2010) (same).

Kohring and Morris are the leading cases and in this area and courts throughout the Country widely cite them.

In Fowler v. Branker, 2013 WL 1232986 (W.D.N.C. 2013), the Court held that even if a prosecutor had reservations about their witnesses' credibility, the prosecution was not required to provide that information to the defense.  It further held that there is no clearly established federal law requiring the State to disclose the mental impressions of its prosecutors.  Those thoughts were echoed by the Court in United States v. Wirth, 2012 WL 1110540 (D. Minn. 2012) (holding that the consensus is that Brady mandates disclosure of exculpatory evidence notwithstanding the work-product doctrine, except where work product is solely mental impressions, conclusions, or legal theories, i.e. so-called "opinion work product.") (citing United States v. Armstrong, 517 U.S. 456, 474–75 (1996)).  On the other hand, the Court in United States v. Haji Bagcho, 151 F. Supp. 3d 60 (D.D.C. 2015) found the first prong of a Brady violation based on government's failure to disclose until after trial that a government agency had found that an important witness had provided information for pay that "seemed unrealistic and sensational" and that the witness was "likely a fabricator and/or information peddler."  The Court, however, concluded that the opinion evidence was not material.  For all of the reasons set forth above, the Court should deny the defendant's motion.  This Court recently rejected a similar request. United States v. Richardson, 2018 WL 4043155, at *3 (W.D. Pa. Aug. 24, 2018) (rejecting defense discovery motion seeking disclosure of "assessments made by law enforcement or counsel for the government concerning witnesses' lack of credibility or reliability, unless such assessments contain otherwise undisclosed underlying exculpatory facts.").

As reflected above, the government is well aware of its obligations under the relevant law to provide exculpatory evidence, and it intends to comply fully with those requirements. The Court should therefore deny the motion,

### C.  SEARCH WARRANTS AND EVIDENCE UNDER RULE 12(b)(1)(b)

The defendant next seeks notice of other search warrants that the defense counsel might not know about. The only search warrant that counsel for the government is aware of that could possibly fall into this category is the search warrant in support of the cellular telephones seized from Mitchell and Devey. Although the defendant was not entitled to those search warrants, the government's records reflect that the government provided those warrants to the defendant. Thus, the Court should deny the motion.

### D.  SCIENTIFIC TESTS AND EXPERT TESTIMONY

The defendant next requests notice of scientific or expert testimony. As this point, the government provided the defendant with lab reports showing that the narcotics seized were determined to be fentanyl, cocaine, and methamphetamine. At trial, the government expects to call as a witness the forensic chemist who conducted the analysis, and as the trial approaches, the government will provide the defendant with a resume of that individual.

The government expects to calls a witness who is an expert in drug trafficking to testify about the use of cellular telephones, the language in cellular telephones, the interaction between firearms and drug trafficking, and to provide opinions about the use of firearms in connection with drug trafficking, the value of narcotics, and personal use versus distribution quantities of narcotics. As the trial approaches, the government intends to identify the witness, provide a summary of his or her expected testimony, and forward a list of the witness's qualifications.

Additionally, the firearm in question was not tested for fingerprints or DNA, mainly

because of the lack of likelihood of obtaining fingerprints or DNA from the firearm.  If, as expected, the defendant intends to challenge the thoroughness of the investigation, the government may call an expert regarding how the difficulty of obtaining this information off of firearms. Alternatively, the government may elect to have the firearm tested for fingerprints and DNA, in which case the government may also present an expert.  In any event, the government is aware of its obligations under Rule 16 with regard to expert notifications, and it intends to comply.

VIII.   CONCLUSION

For the reasons set forth above, the Court should deny all of the defendant's pretrial motions without a hearing and schedule this matter.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

/s/ Brendan T. Conway
BRENDAN T. CONWAY
Assistant United States Attorney
U.S. Post Office and Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
PA ID No. 78726

32