## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                           |   |               |
|---------------------------|---|---------------|
| UNITED STATES OF AMERICA, | ) |               |
|                           | ) |               |
| v.                        | ) |               |
|                           | ) | 2:17-cr-00243 |
| JAMES W. JOHNSON,         | ) |               |
|                           | ) |               |
| Defendant.                | ) |               |
|                           | ) |               |
|                           | ) |               |

## **OPINION**

**Mark R. Hornak, Chief United States District Judge**

On September 13, 2017, a federal grand jury returned a three-count indictment charging Defendant James Weldon Johnson ("Defendant") with possession with intent to distribute fentanyl, cocaine base, powder cocaine, and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and with possession and distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (841(b)(1)(C).[1] (Indictment, ECF No. 1.)

Now before the Court are seven (7) pretrial motions filed by Defendant Johnson: (1) Motion to Produce Evidence the Government Intends to Use under Federal Rules of Evidence 404(b) and 609; (2) Motion for Discovery; (3) Motion to Suppress Evidence—Cellular Phones (Federal Search Warrant); (4) Motion to Suppress Evidence—Cellular Phones (State Search Warrant); (5) Motion to Suppress Evidence (Search of Renova Street); (6) Motion to Suppress

---

[1] On October 1, 2019, the Government filed a superseding indictment, which includes the same three (3) charges, as well as a fourth charge for possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Superseding Indictment, ECF No. 57.)

Evidence Stemming from Arrest; and (7) Motion to Expand Evidentiary Record. (ECF Nos. 36, 37, 39–42, 48.) For the reasons set out in this Opinion, the motions to suppress evidence at ECF Nos. 39–42 are DENIED. The motions at ECF Nos. 36, 37, and 48 will be addressed in the Court's Pretrial Order.

Chiefly, Defendant seeks to suppress all evidence obtained during searches of (1) his person incident to arrest, (2) a Renova Street (Pittsburgh, PA) residence, and (3) two (2) cell phones. With respect to the searches of the house on Renova Street and the two (2) cell phones, Defendant argues that the affidavits proffered in the warrant applications failed to establish probable cause. With respect to the search of his person, Defendant argues that law enforcement officers lacked probable cause to arrest him. Defendant also seeks a *Franks* hearing, arguing that the probable cause affidavits in support of the cell phone warrants contained deliberate or recklessly false statements and omissions that were material to a finding of probable cause. The Government filed its response to pretrial motions on February 28, 2019 and the Defendant subsequently filed a motion to expand the evidentiary record on May 3, 2019. (ECF Nos. 46, 48.) Counsel for the Defendant and the Government fully briefed the issues. (ECF Nos. 36, 37, 39–42, 46, 48.) The Court held an evidentiary hearing and oral argument on June 19, 2019, concerning the Defendant's motions. (ECF No. 49.) Thereafter, a transcript was ordered and prepared (ECF No. 53), and the matter became ripe for disposition.

## I.  **FACTUAL FINDINGS**

Testifying for the Government at the evidentiary hearing was Pittsburgh Bureau of Police Detective Robert Berberich ("Det. Berberich").

"It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions

to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Harris*, 884 F. Supp. 2d 383, 387 (W.D. Pa. 2012) (internal citations and quotations omitted). Based on the Court's consideration of the testimony and demeanor of Det. Berberich at the hearing before the Court on these motions, the Court finds and concludes that he was credible. The Court makes the following factual findings based on that testimony and consideration of the evidence in the record.

### a. Initial Criminal Activity

Det. Berberich is a plainclothes detective with the Pittsburgh Bureau of Police ("PBP") who was involved in an investigation of suspected drug trafficking activity occurring in the Hazelwood section of Pittsburgh, in a portion known as a "high-crime" area. (Evidentiary Hr'g Tr. ("Tr."), at 23:12, 28:7–11, ECF No. 53.) Det. Berberich and his partner, Officer Tariq Francis, were patrolling the Hazelwood area in an unmarked car on December 30, 2016. (*Id.* at 29:17–25, 30:1–3.) Det. Berberich observed a vehicle traveling up Renova Street with two occupants inside. (*Id.* at 30:4–9.) The vehicle stopped short of the subject house on Renova Street ("the Residence") and dropped off the passenger. (*Id.* at 31:3–5.) The vehicle then did a U-turn and parked outside of the Residence and waited for the passenger to return. (*Id.* at 31:7–9.) Det. Berberich observed as the passenger, later identified as James Mitchell, walked toward the Residence and was met by the Defendant, who walked down from the Residence's porch. (*Id.* at 31:17-25.) Det. Berberich had previously seen the Defendant consistently going in and out of the Residence almost daily throughout the summer of 2016 and leading up to the date of arrest. (*Id.* at 63:20–64:8.) During this period of time, Det. Berberich also saw other members of Defendant's family going in and out of the Residence. (*Id.* at 64:9–15.) The Residence was owned by the Defendant's mother. (*Id.* at 69:5–7.)

Det. Berberich observed what he believed to be, based on his training and experience, a hand-to-hand drug transaction on the sidewalk in front of the Residence involving the Defendant and James Mitchell, which lasted for just a few seconds. (*Id.* at 32:2–10, 33:21, 34:3.) At the time, Det. Berberich's unmarked car was parked in a nearby alleyway and he used binoculars to view that interaction. (*Id.* at 32:23–25, 33:3–5.) He was able to clearly see and recognize the Defendant during the transaction. (*Id.* at 34:25.) Det. Berberich was personally familiar with the Defendant's appearance from a prior traffic stop, which occurred during the summer of 2016, and from reviewing the Defendant's Facebook page. (*Id.* at 36:2–7, 70:8–18.) Additionally, Det. Berberich was familiar with the Defendant's alleged membership in the Hazelwood Mob Gang from a previous arrest, photos of alleged gang members, and from discussions with other officers and detectives in 2011 and 2012. (*Id.* at 38:1–5, 41:3–11, 43:1–10.) Det. Berberich never received any information to suggest that Defendant had withdrawn from his association with the Hazelwood Mob. (*Id.* at 70:19–24.) However, Det. Berberich was not aware of any prior police reports that explicitly refer to Defendant's membership in a gang. (*Id.* at 45:16–19.)

After the hand-to-hand transaction, Det. Berberich observed James Mitchell return to the vehicle and then hold up a "plastic baggy" with a bundle of heroin visible inside, before opening the door and getting in. (*Id.* at 48:5–12, 51:3–5.) Det. Berberich subsequently initiated a traffic stop of the vehicle for a traffic violation and asked James Mitchell and the driver, Justin Devey, about the transaction he had just observed. (*Id.* at 48:13–15, 49:19–23; Def.'s Mot. to Suppress Evid. Stemming from Arrest, Ex. A, ECF No. 42-1, at 5.) During the stop, Det. Berberich also observed narcotics in plain view on the floor of the car behind the driver's side seat. (Tr. at 50:17–24.) They included narcotics in a bag similar to the one Det. Berberich observed after the hand-to-hand transaction had occurred. (*Id.* at 51:1–5.) Det. Berberich then showed James Mitchell a photo

of Defendant from the Defendant's Facebook profile and asked if Defendant was the one from whom Mitchell had purchased the drugs. (*Id.* at 55:4–11.) Mitchell replied that he was. (*Id.* at 55:12.) Det. Berberich detailed these events in his investigative report. (ECF No. 42-1, at 5–7.)

b. Arrest Warrant and Search Warrant

Det. Berberich applied for an arrest warrant for the Defendant on December 30, 2016, and then for a search warrant for the Residence on Renova Street on January 1, 2017. (*Id.* at 24:1–15, 56:19.) The arrest warrant was not issued until January 3, 2019, one day after the Defendant's actual arrest. (*Id.* at 24:16–17, 56:21.) The details of Det. Berberich's December 30, 2016 investigation were recounted in his applications for the arrest warrant, and for a search warrant of the Residence. (Def.'s Mot. to Suppress Evid. (Search of Renova Street), Ex. A, ECF No. 41-1, at 2–3; ECF No. 42-1, at 5–6.) Additional relevant circumstances attested to in the affidavits include:

1. That police previously received a complaint about the Residence.[2] (ECF No. 41-1, at 2.)
2. When Det. Berberich first drove past the Residence, no one was visible on the porch and the door was closed. (*Id.*)
3. From the time Det. Berberich drove past the Residence until witnessing what he believed was the hand-to-hand drug transaction, no one else (other than Defendant) entered or exited the Residence. (*Id.*)

c. Execution of the Search Warrant and Defendant's Arrest

On January 2, 2017, Det. Berberich was present when law enforcement executed the search warrant for the Residence. (Tr. at 25:1–3.) When SWAT officers announced over a loud speaker that they had a search warrant, Det. Berberich believed he heard SWAT Operator Mescan call over the police radio that there was a male running from the front door of the Residence, though he did

---

[2] While the affidavit does not explicitly say so, it implies that the complaint was related to suspected gang or drug dealing activity.

not witness this personally. (*Id.* at 25:5–9, 58:19–25, 59:3–4, 15–23.) The male, who turned out to be the Defendant, was then detained on the sidewalk. (*Id.* at 25:11–18.) Det. Berberich then entered the Residence after hearing over the police radio that law enforcement officers observed heroin and stamp bags in the kitchen of the Residence. (*Id.* at 25:12–21.) At that time, Defendant was placed under arrest based on what was observed in the Residence from which he was seen leaving. (*Id.* at 26:1–2, 16–17.) The decision to arrest the Defendant was also predicated on the evidence gleaned from the December 30, 2016 investigation. (*Id.* at 26:19–21 (referring to the evidence in the search warrant affidavit).) Defendant was then searched incident to his arrest, yielding keys to the front door of the Residence in his pocket, and the cell phones that were later searched. (*Id.* at 26:24–27:4.)

    d.  Cell Phone Search Warrants

    On January 18, 2017, Det. Berberich filed a state search warrant application for the two (2) cell phones recovered from the Defendant's person, which was approved by a Pennsylvania Magisterial District Judge. (Def.'s Mot. to Suppress Evid.—Cellular Phones (State Search Warrant), Ex. A, ECF No. 40-1.) In his affidavit, Det. Berberich attested to the following pertinent details:

1. Det. Berberich had training, education, and experience in narcotics investigations. (*Id.* at 2.)

2. A search warrant for the Residence was executed on January 2, 2017. (*Id.*)

3. Upon approaching the Residence, SWAT Operator Mescan observed Defendant "run" out of the Residence via the front screen door. (*Id.*)

4. Defendant was the "main target" and a "known actor/Hazelwood Mob member." (*Id.*)

5. Defendant was taken into custody and subsequently heroin stamp bags were discovered in the Residence. No one else was found in the Residence at that time. (*Id.*)

6. A thorough search of the Residence yielded, among other things, a pistol, extended ammunition magazines, narcotics and associated paraphernalia, cash, a ballistic vest, and various electronics. (*Id.*)

7. The search of Defendant yielded two (2) cell phones and keys that opened the front door of the Residence. (*Id.* at 2–3.)

8. Another individual, Whitney Fennell, was observed near the Residence during the search, and was briefly detained, identified, and released. (*Id.* at 2.)

9. At the time of the search warrant execution, Defendant was the only person "inside the residence" and considered its sole possessor at the time. (*Id.*)

10. Det. Berberich had previously seen the Defendant coming in and out of the Residence on a daily basis. (*Id.*)

11. Tanya Johnson is the owner of the Residence and the mother of the Defendant. She was not present at the time of the search. (*Id.* at 3.)

12. Det. Berberich's training, education, and experience led him to conclude that cell phones are often used in furtherance of street level narcotics transactions and are a crucial tool in the drug trade. (*Id.*)

13. Det. Berberich concluded that text messages, photos, contact lists, and voicemails in the cell phone of persons suspected of drug crimes were likely to yield evidence of associated criminal conduct. (*Id.*)

When this case was adopted for federal prosecution, Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agent James Fidler applied for two (2) federal search warrants

encompassing the cell phones seized from Defendant, both of which employ the same key language in the supporting affidavits.[3] (Def.'s Mot. to Suppress Evid.—Cellular Phones (Federal Search Warrant), ECF No. 39, at 2.) The statements in Agent Fidler's affidavits were based primarily on discussions with and information provided by other law enforcement officers and witnesses, his review of documents and records, and his personal knowledge, observations, experience, and training. (*Id.* at 13; Omnibus Resp. to Pretrial Mots., Ex. E, ECF No. 46-5, at 3; Omnibus Resp. to Pretrial Mots., Ex. F, ECF No. 46-6, at 3.) The federal warrant affidavits included information similar to the state affidavit authored by Det. Berberich. Agent Fidler recounted the execution of the search warrant of the Residence, the contraband discovered, and his awareness that "evidence of drug, firearm, and money laundering crimes can often be found in electronic media." (ECF No. 46-5, at 5–7; ECF No. 46-6, at 4–12.) He also described the December 30, 2016 hand-to-hand drug transaction and subsequent traffic stop, which the state search warrant affidavit did not include. (ECF No. 46-5, at 5; ECF No. 46-6, at 4.) More specifically, and partly at issue in this case, Agent Fidler stated that Defendant was "at the residence" when SWAT arrived and that "he attempted to flee." (ECF No. 46-5, at 4–5; ECF No. 46-6, at 4.) Agent Fidler also stated that PBP observed the Defendant "conduct a hand to hand transaction *from* the residence." (ECF No. 46-5, at 4; ECF No. 46-6, at 5 (emphasis added).)

e. State Court Proceedings

Prior to federal adoption of this case, the Defendant had several pre-trial hearings in the Court of Common Pleas of Allegheny County, Pennsylvania. Defendant relies upon testimony from three (3) state court hearings in his motions for a *Franks* hearing and for the suppression of

---

[3] The February 26, 2018, warrant applied to a black Cricket cell phone and a white iPhone recovered from the Defendant's person during his arrest. The January 29, 2019, warrant applied only to the white iPhone recovered from the Defendant's person during his arrest.

certain evidence.[4] The following statements from those hearings form the factual predicate of Defendant's motions.

1. Det. Berberich stated that SWAT Operator Mescan ("Mescan") saw Defendant coming out of the Residence when the search warrant was executed. (Omnibus Resp. to Pretrial Mots., Ex. A, ECF No. 46-1, at 20 ("H.T. 2/9/17"); Omnibus Resp. to Pretrial Mots., Ex. C, ECF No. 46-3, at 88 ("H.T. 7/17/17").) Det. Berberich further testified that Mescan saw Defendant "run from the house." (H.T. 7/17/17 at 90.)

2. Mescan testified that he saw Defendant on the porch and "*walking* down the stairs" when the police arrived. (Omnibus Resp. to Pretrial Mots., Ex. D, ECF No. 46-4, at 23–24 ("H.T. 7/21/17") (emphasis added).) He then relayed this information to other SWAT team members. (*Id.* at 23.) Further, he affirmed he did *not* tell his tactical commander he observed "somebody running from the house." (*Id.* at 39–40.)

3. When asked if the Defendant was "in" the Residence when the police executed the search warrant for the Residence, Det. Berberich testified, "yes." (H.T. 2/9/17 at 7–8.) However, Mescan testified that he never saw Defendant inside the Residence, but rather on the porch only. (H.T. 7/21/17 at 30.)

4. Mescan testified that when he said he saw Defendant leaving the Residence, he meant to indicate Defendant was seen leaving the "curtilage" of the home, specifically the porch. (*Id.* at 30, 40.)

---

[4] Those hearings are the Defendant's state preliminary hearing, a state suppression hearing that spanned two days, and a separate state court evidentiary hearing.

## II.  ANALYSIS

### A. Motion to Suppress Evidence Stemming from the Search of the Renova Street Residence (ECF No. 41)

Defendant moves to suppress all evidence gathered from the search of the Residence. Defendant argues that the probable cause affidavit to support the search warrant "fail[ed] to establish a fair probability that contraband or evidence would be recovered." (ECF No. 41, at 1.) Defendant argues the affidavit did not indicate that he or others distributed narcotics from or stashed narcotics in the Residence. (*Id.*) Furthermore, he argues that the affidavit relied upon an "unreliable witness," referring to James Mitchell. (*Id.*)

#### 1. *Standing to Challenge the Search*

In its brief, the Government does not concede that the Defendant has standing to challenge the search of the Residence. (Omnibus Resp. to Pretrial Mots., ECF No. 46, at 6.) As a threshold matter, the Court must determine whether the Defendant has such standing.

"Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). In order to have standing to challenge a search, an individual must be able to demonstrate that he had a reasonable expectation of privacy in the place or property searched. *Minnesota v. Olson*, 495 U.S. 91, 95–97 (1990). That requires a defendant show both that he had a subjective expectation of privacy and that his expectation was objectively reasonable. *Rakas*, 439 U.S. at 143 n.12. With respect to a dwelling, "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas*, 439 U.S. at 142. Distinctions from property and tort law, such as whether the defendant was a licensee, invitee, or guest, do not control this inquiry.

*Id.* at 143. Co-residents and overnight guests are typically held to have a reasonable expectation of privacy in the dwellings of others. *United States v. King*, 364 F. App'x 781, 786 (3d Cir. 2010) (citing *Olson*, 495 U.S. at 97; *United States v. Villegas*, 495 F.3d 761, 772 (7th Cir.2007)).

In *United States v. Rose*, the Third Circuit rejected an attempt to extend standing to a social guest at the apartment of a long-time acquaintance and a friend. 613 F. App'x 125, 128 (3d Cir. 2015).[5] In so doing, the Court analyzed *Jones v. United States,* 362 U.S. 257 (1960), and *Rakas v. Illinois*. *Rose,* 613 F. App'x at 129. In *Jones*, the Supreme Court held that a defendant arrested at his friend's apartment during the execution of a search warrant could challenge the search because he was "legitimately on [the] premises." *Jones*, 362 U.S. at 267. The Supreme Court in *Rakas* later rejected *Jones* 's "legitimately on [the] premises" standard as "too broad". 439 U.S. at 142. *Rakas* held that "*Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Id.* Thus, the Third Circuit observed, "*Rakas* recognized that, as an overnight guest, Jones was much more than just legitimately on the premises." *Rose*, 613 F. App'x at 129. The Third Circuit then noted that the Supreme Court in *Minnesota v. Olson* reaffirmed the holding in *Rakas* that a defendant has standing to challenge a search when he is an overnight guest. 495 U.S. at 98–100. Therefore, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Rose*, 613 F. App'x at 129 (quoting *Minnesota v. Carter,* 525 U.S. 83, 90 (1998)).

However, where Fourth Amendment rights attach on the spectrum between an overnight guest and those simply present with the consent of the homeowner is still unclear. *Id.* ("Perhaps in

---

[5] As an unpublished opinion, the case does not constitute binding precedent, but can and does provide persuasive reasoning.

the future, it may be necessary for us to decide whether Fourth Amendment rights attach somewhere on the spectrum between overnight guest and merely present with the consent of the householder. We need not do so now.") (internal quotations omitted). In holding that the defendant in *Rose* lacked standing to challenge the search of the apartment, the Third Circuit pointed to several factors. The defendant there (1) had no possessory interest in the apartment; (2) stored no clothing or property there; (3) had no key to enter the apartment; (4) had no permission to be present without the owner's presence or consent; (5) received no mail at the apartment; (6) had no ability to and made no effort to exclude others from any part of the apartment; (7) was a casual acquaintance of the owner; (8) was an infrequent visitor to the apartment; and (9) because five other guests had common access to the areas in the apartment occupied by the defendant. *Id.* at 129–30. The Third Circuit did not create a multi-factor rule, but rather found these factors persuasive in demonstrating that the case did not "present a close call" necessitating a precise determination of when Fourth Amendment rights attach. *Id.* at 129. However, these factors are useful in analyzing the Defendant's standing here. Other courts of appeal have similarly engaged in a similar analysis when deciding whether a defendant has standing in another's home. *United States v. Fields*, 113 F.3d 313, 320–21 (2d Cir. 1997) (holding defendant had standing in another's home because he had a key, paid to use the apartment, frequently made use of the apartment, could bring guests, and could come and go even when the lessee was not present); *United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir. 2000) (holding defendant had standing in another's home because he was friends with the lessee for seven years, stayed at the home earlier in the week, occasionally spent the night at the home, kept personal belongings in the living room closet, ate meals with the family during visits, and was allowed to stay in the home even if the residents were not present).

In this case, Defendant does not assert, and there is no record evidence, that he was an overnight guest or co-resident of the Residence. Therefore, he does not fall within the well-accepted categories of those who may assert standing over another's dwelling. Still, the Defendant is much nearer the possessory end of the spectrum alluded to by the Third Circuit in *Rose*, 613 F. App'x at 129. First, the evidence shows that he was seen at the Residence on an almost daily basis and had access to the Residence via the housekey found on his person. (Tr. at 27:2–4, 63:20–64:8.) Second, unlike Rose, Defendant was not merely a casual acquaintance of the owner—he is the owner's son. (*Id.* at 99:13.) Third, it appears that Defendant did have permission to be present without the presence or consent of the owner—his mother—as evidenced by the fact that he was present at the Residence when the search warrant was executed and his mother was not. (ECF No. 40-1, at 3.) Fourth, the Government alleges that Defendant stored property at the Residence in the form of the various items of contraband that are the focus of this case. However, Defendant argues in his other motions that PBP recovered no evidence from the search directly connecting the Defendant to the home. (*See* ECF No. 41, at 9–10 (discussing the indicia attached as exhibits to the state cell phone warrant).) Further, there is no evidence that Defendant meets any of the other factors from *Rose*, such as having a possessory interest in the home, the exclusion of others from the property, or his receipt of mail to that address. There is also some evidence that there were other guests with access, namely other members of the Defendant's family previously seen entering and exiting the Residence. (Tr. at 64:9–15.) Still, the Court concludes that the factors that do apply to the Defendant make for a much more solid standing argument than in *Rose*, specifically his frequenting of the Residence, his possession of a working key to the Residence, his familial relationship to the owner, and his apparent ability to remain at the Residence without the consent or presence of the owner. Thus, the Court concludes that the Defendant does have standing to

-13-

challenge the search of the Residence based on the sum total of the record evidence. Considered as a whole, the record shows that his subjective expectation of privacy in the Residence on Renova Street was objectively reasonable. *See Rakas*, 439 U.S. at 143 n.12.

### 2. Sufficiency of the Search Warrant for the Residence

Subject to certain exceptions, evidence seized in violation of a defendant's Fourth Amendment rights may not be admitted in a criminal prosecution against a defendant. *See generally Mapp v. Ohio*, 367 U.S. 643 (1961). It is well-established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

In approving or denying an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The legal standard for a District Judge reviewing the issuance of a search warrant is highly deferential. As the Supreme Court has explained, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (quoting *Jones*, 362 U.S. at 271). A reviewing court may not conduct a *de novo* review of an issuing judge's probable cause determination. *Id.* at 236.

Defendant alleges that the warrant application for the Residence failed to establish a fair probability that contraband or evidence would be recovered from the Residence primarily because the affidavit did not indicate that the Defendant or others distributed narcotics from or stashed

-14-

narcotics in the Residence. (ECF No. 41, at 1.) Defendant also argues that the claim in the affidavit that Defendant engaged in a hand-to-hand drug transaction was insufficiently supported and relied primarily on the word of an unreliable witness, referring to James Mitchell. (*Id.*) To the contrary, the Court concludes that information attested to by Det. Berberich in the affidavit, and affirmed in his testimony, provided the state magistrate judge with a substantial basis to find probable cause to search the Residence. Here's why.

Det. Berberich was able, using binoculars, to clearly see and recognize the Defendant as he walked down the front steps of the Residence to meet Mitchell on the sidewalk out front. Then, Det. Berberich witnessed what he believed, given his training and experience, was a hand-to-hand drug deal between the Defendant and Mitchell. (Tr. at 32:2–10, 33:21, 34:3–25.) As Mitchell walked away, Det. Berberich observed Mitchell hold up a bag of what Det. Berberich "immediately knew to be bundles of heroin." (ECF No. 41-1, at 2; Tr. at 48:5–12.) Further, the absence of anyone on the porch of the Residence when Det. Berberich first drove by it provided a fair basis to conclude that Defendant came out of the Residence immediately prior to the alleged hand-to-hand drug transaction in front of the Residence. (ECF No. 41-1, at 2.) Defendant was also seen regularly going in and out of the Residence for a period of months leading up to the arrest and search, and there had been a citizen complaint specifically lodged about the Residence, which is located in a "high-crime" area. [6] (Tr. at 28:7–11, 63:20–64:20; ECF No. 41-1, at 2.) The Court

---

[6] Defendant argues that these observations are not enough for probable cause, because Det. Berberich's averments in his affidavit were "based on a mere presumption" that Defendant engaged in a drug deal, and illustrated no connection to the Residence. (ECF No. 41, at 6–7.) Det. Berberich's "presumption" of a hand-to-hand drug transaction was belied, Defendant argues, by the fact that: (1) his view was partly obstructed; (2) he only observed two individuals meet briefly on a sidewalk; and (3) the evidence only established that Mitchell had narcotics after the meeting, but not that Defendant was the actual seller or that Mitchell did not already have narcotics before the meeting. (*Id.* at 6.) Defendant also argues the affidavit does not connect Defendant's single, alleged drug sale to the Residence itself. (*Id.* at 6–7.) For instance, Defendant was only observed coming off the porch and onto the sidewalk—both publicly accessible areas. (*Id.* at 7.) These arguments have a necessary premise that Det. Berberich was not credible (the Court concludes he was) and would require magistrate judges have near-to-absolute certainty before issuing a warrant. That burden is not the one set by the law.

-15-

concludes that this evidence, strengthened by Det. Berberich's subsequent corroboration of the drug transaction during the traffic stop of Mitchell and Devey, provided the magistrate judge with a substantial basis to find probable cause to issue a search warrant for the Residence.

However, Defendant also challenges the magistrate judge's partial reliance on Mitchell's identification of the Defendant as the seller. He argues that Mitchell was not a government informant with a track record of reliability. (ECF No. 41, at 7–8.) Therefore, the Government should have taken steps to corroborate his claim. (*Id.*) Defendant cites *United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996), for the proposition that the failure to conduct some kind of follow-up investigation on Mitchell's claim, such as a controlled buy or further surveillance, "create[d] a situation where probable cause [was] lacking." (ECF No. 41, at 8.) However, the *Weaver* Court addressed an affidavit that was "based almost entirely on hearsay information" from a confidential informant. *Weaver*, 99 F.3d at 1377. In fact, the officer who applied for the warrant there presented "no underlying factual circumstances" to support the informant's knowledge or the belief that narcotics would be present in the home. *Id.* at 1378. That is not the case here. The affidavit here provides important additional underlying factual predicates—(1) Det. Berberich personally observed what he believed, based on his training and experience, was a hand-to-hand drug sale by Defendant in front of the Residence; (2) Det. Berberich saw Mitchell holding narcotics immediately following the hand-to-hand transaction; (3) the absence of anyone on the porch when Det. Berberich first drove by just before witnessing the hand-to-hand transaction suggests that it was the Defendant that came out of the Residence; (4) the Defendant was seen by Det. Berberich coming and going from the Residence regularly in the months leading up to the transaction he witnessed; (5) PBP had received a prior complaint for police service at the Residence; and (6) Hazelwood is a "high-crime" area.

Furthermore, Mitchell did not identify the Defendant as a career drug dealer, for example, which would necessitate further corroboration. Rather, Mitchell identified the Defendant as the person who had just sold him the drugs found in his car. (ECF No. 41-1, at 2.) For all intents and purposes, that statement was corroborated by what Det. Berberich personally observed in front of the Residence, and then what he found in the car. In other words, the warrant was not based on uncorroborated hearsay from an informant. In conjunction with Mitchell's identification of the Defendant, there existed ample other factual bases grounded on Det. Berberich's personal observations from which the issuing magistrate judge could properly conclude that evidence of drugs and drug dealing would likely be uncovered in the Residence, even before considering that the Residence was in a "high-crime" area, that the Residence was the subject of a prior citizen complaint, and that Defendant was allegedly a member of the Hazelwood Mob gang. In upholding the magistrate judge's probable cause determination, the Court is mindful that "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place" in probable cause determinations. *Gates,* 462 U.S. at 235. Instead, the Court must assess the totality of the circumstances in evaluating whether a judge has met this "practical and common-sensical standard." *Florida v. Harris*, 568 U.S. 237, 244 (2013). The Court concludes that, given the various elements attested to in the affidavit by Det. Berberich, the state magistrate judge had a substantial basis to find probable cause to support the search warrant for the Residence.

### 3. *Good Faith Exception*

Under the good faith exception to the exclusionary rule, suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority," even though no probable cause to search exists. *United States v. Zimmerman*, 277 F.3d

426, 436 (3d Cir. 2002) (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1999)). "'A warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *United States v. Leon*, 468 U.S. 897, 922 (1984) (quoting *United States v. Ross*, 456 U.S. 798, 823 n.32, (1982)). The Third Circuit has identified four (4) situations where an officer's reliance on a warrant does not implicate this good faith exception:

- Where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;

- Where the magistrate abandoned his judicial role and failed to perform his neutral and detached function;

- Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

- Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Zimmerman*, 277 F.3d at 436–37 (internal citations omitted). The Defendant contends that the third situation applies here—that the warrant was so lacking in indicia of probable cause that it rendered any belief in its existence entirely unreasonable. (ECF No. 41, at 10.) The Court disagrees for all of the reasons noted above. The affidavit contained sufficient indicia of probable cause, and certainly was not facially deficient as to such matters. Simply put, even in the event that the affidavit did not surpass the quantum of evidence necessary for probable cause, the affidavit provided sufficient indicia of legality for an officer to reasonably rely on its authority. This includes the observations of Det. Berberich, the identification of the Defendant by Mitchell, the

prior complaint involving the Residence, and its location in a "high-crime" neighborhood. (ECF No. 41-1, at 2–3.) Therefore, the good faith exception applies here.

The Court concludes that the search warrant was supported by the necessary probable cause basis for the state magistrate judge to find probable cause to search the Residence for evidence of narcotics and associated activity, and even if it did not, it was not facially deficient, triggering the application of the "good faith" exception.[7] Defendant's Motion to Suppress Evidence (Search of Renova Street), ECF No. 41, is denied.

B. Motion to Suppress Evidence Stemming from Defendant's Arrest (ECF No. 42)

Defendant moves to suppress all evidence gathered from the search incident to his arrest on January 2, 2017. Defendant argues that PBP lacked probable cause to arrest him at that time. (ECF No. 42, at 1.) Defendant focuses on the fact that, at the time he was arrested, police had not yet obtained an arrest warrant, and that his arrest was otherwise premised solely on his proximity to a house containing narcotics. (*Id.*) He asks the Court to suppress the items that were found on his person when he was arrested.

The Fourth Amendment shields individuals from unreasonable searches. *Draper v. United States*, 358 U.S. 307, 308 n.1 (1959). Searches conducted without a warrant "are *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357. One such exception is a search incident to a lawful arrest. *See generally Chimel*

---

[7] While Defendant never raised the issue, the affidavit provided no specific information indicating that firearms specifically were likely to be recovered. *See, e.g., United States v. Davis*, No. 2:13-CR-00068, 2014 WL 1394304, at *5–7 (W.D. Pa. Apr. 9, 2014) (holding that a warrant to search a residence for evidence of narcotics and firearms was overly broad with respect to the firearm portion of the warrant because the factual basis for probable cause to believe weapons would be recovered was based solely on an uncorroborated tip from a "concerned citizen"). However, the narcotics portion of the warrant here remains valid. Therefore, the police were lawfully present and able to search the Residence for narcotics, whereupon the weapons were discovered in places where a reasonable officer would expect evidence of narcotics could be found. *See Horton v. California*, 496 U.S. 128, 138–42 (1990) (establishing the "plain view doctrine" in Fourth Amendment analysis). Those places included the kitchen shelves and cabinets, the kitchen counter and floor, behind and under furniture, and in the bedroom area. (ECF Nos. 40-1–40-3). The Court therefore would not suppress the evidence of weapons or firearms on this basis in any event.

*v. California*, 395 U.S. 752 (1969). The scope of a search incident to arrest is limited to the arrestee's person and the area within his immediate control. *Id.* at 763. Defendant does not challenge the scope of the search incident to arrest, but instead challenges the underlying probable cause for his warrantless arrest that led to the search.

Warrantless arrests must be based on probable cause. *Draper*, 358 U.S. at 310–11. Probable cause requires that at the time of arrest, the facts and circumstances within the knowledge of the arresting agents, and of which they have reasonably trustworthy information, are sufficient to warrant a prudent individual in believing that the arrestee had committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The probable cause inquiry requires a totality-of-the circumstances analysis as to whether a fair probability existed that a crime had been or was being committed by the arrestee. *Gates*, 462 U.S. at 246.

The Court agrees that law enforcement officers did not possess a valid arrest warrant at the time of Defendant's arrest, but concludes that they nonetheless possessed the requisite probable cause to arrest the Defendant without a warrant. Det. Berberich was the arresting officer on January 2, 2017. (Tr. at 61:24–62:1.) The Defendant was first detained upon the arrival of PBP SWAT officers, when he was observed leaving the porch of the Residence.[8] (*Id.* at 10–12.) At the moment Defendant was arrested after he was detained, Det. Berberich possessed several pieces of information that established probable cause to arrest the Defendant. Defendant was the only person known to be present at the Residence when SWAT arrived, even if he was seen only on the porch

---

[8] There is some dispute about whether the defendant was running from the Residence or walking down from the porch, but it is not disputed that Defendant was seen by SWAT officers leaving the porch of the Residence when they arrived to execute the warrant for that Residence. (Tr. at 96:7–20.) Given this fact, while Defendant does not challenge the constitutionality of his initial detention, the Court concludes that the detention prior to arrest was based on reasonable, articulable suspicion to believe Defendant had engaged in criminal conduct. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

and not inside the Residence, one that Det. Berberich has seen him come in and out of many times.[9] After they secured the Residence, SWAT officers observed heroin and stamp bags in plain view in the kitchen. (*Id.* at 25:18–21.) Det. Berberich then entered the Residence and personally witnessed the narcotics in the kitchen. (*Id.* at 25:22–25.) Defendant was placed under arrest after these observations, but even these facts do not capture the full scope of the evidence known to Det. Berberich at the time of the arrest. (*Id.* at 26:1–2.) Det. Berberich also credibly testified that the Defendant engaged in a hand-to-hand narcotics transaction right outside of the Residence just two days prior to arrest. Det. Berberich, through his training and experience, was able to recognize and identify the Defendant, as well as the bag of heroin in James Mitchell's hand immediately after that transaction. (Tr. at 34:25, 48:5–12.) The Court concludes that Det. Berberich would have had a legally sufficient basis to arrest the Defendant in that moment. Yet, in further strengthening his basis for probable cause to arrest, Det. Berberich then obtained a positive identification of the Defendant as the seller from the alleged buyer, James Mitchell, moments later in a traffic stop. (*Id.* at 55:4–12.) Applying a totality-of-the-circumstances analysis, the Court concludes that Det. Berberich reasonably believed that a fair probability existed that a crime was or was being committed by the Defendant after witnessing the hand-to-hand drug sale. *Gates*, 462 U.S. at 246. The subsequent positive identification from Mitchell and later discovery of evidence within the Residence served to further strengthen his probable cause basis to arrest the Defendant, when quantities of illegal drugs were found in the Residence. Under the "search incident to arrest" exception, the evidence seized from the search of the Defendant at his arrest will not be suppressed.

---

[9] Whitney Fennell was observed in the immediate back alley behind the Residence when SWAT arrived. He was briefly detained, questioned, and released, but no evidence has been presented that he was seen on the property when SWAT arrived. (ECF No. 39, at 11.) Who detained, questioned, and released Mr. Fennell, and why he was released, is not in the record.

*See Chimel*, 395 U.S. at 762–63. Accordingly, Defendant's Motion to Suppress Evidence Stemming from Arrest, ECF No. 42, is denied.[10]

## C. Motion to Suppress Evidence—Cellular Phones (State Search Warrant) (ECF No. 40)

Defendant also moves to suppress all evidence gathered from the searches of two (2) cellular phones that were recovered from his person at the time of his arrest. Both federal and state search warrants are at issue, and the Court will first address the state warrant. The Defendant argues that the probable cause affidavit to support that search warrant "presented materially false statements that were either intentional in nature or made with a reckless disregard for the truth." (ECF No. 40, at 1.) Second, the Defendant argues that the Government also withheld material information from the magistrate judge that would be relevant to the magistrate judge's probable cause determination. (*Id.*) Lastly, he argues that the affidavits failed to provide a sufficient nexus between the alleged crimes and the cell phones. (*Id.*)

### 1. Franks *Hearing*

Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to pursue his claims that the affidavit contained critical falsehoods and omissions regarding the events that occurred during the execution of the search warrant on January 2, 2017. For the following reasons, the Court concludes that Defendant is not entitled to a *Franks* hearing.

---

[10] The Government also posits in the alternative that evidence gathered pursuant to Defendant's arrest would be admissible under the "inevitable discovery" doctrine. (ECF No. 46, at 11–12.) That doctrine provides that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The Government argues that the arrest warrant, which was granted a day after Defendant's arrest, would have inevitably led to Defendant's arrest and subsequent seizure of certain of his property. However, The Government has not shown by a preponderance of the evidence that Defendant would have necessarily had the same property on him had he been arrested at a later date. For instance, Defendant might have had only one cell phone or no cell phones in his pockets on that later day. The Court therefore concludes the Government has not met its burden to sustain this alternative argument.

A *Franks* hearing to challenge a search warrant affidavit may only be granted if a defendant makes a "substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) "the allegedly false statement is *necessary* to the finding of probable cause." *Franks*, 438 U.S. at 155–56 (emphasis added). Analyzing what constitutes "reckless disregard for the truth" differs between misstatements and omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). More specifically, with respect to omissions, "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Id.* at 788 (citing *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)) (internal quotations omitted). "If the defendant makes the requisite substantial showing for a *Franks* hearing and then, at that hearing, shows by a preponderance of the evidence that material statements in the affidavit are either recklessly or intentionally untruthful, the fruits of the search must be excluded unless the remaining content of the warrant is sufficient to establish probable cause." *United States v. Brown*, 3 F.3d 673, 676 (3d Cir. 1993). Put differently, even if the affiant made a false statement, the statement must be *necessary* to a finding of probable cause in order for a hearing to occur and evidence to be suppressed. *See United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006). Moreover, "[a]llegations of negligence or innocent mistake are insufficient," *Franks*, 438 U.S. at

171, and the law does not require "elaborate specificity" in affidavits for search warrants. *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

With respect to the state search warrant for the Defendant's cell phones, Defendant argues that there are two "critical falsehoods." First, the affidavit posited that Defendant was seen "running" out of the Residence, when in fact he was only seen walking from it.[11] (ECF No. 40-1, at 2.) Second, the Defendant says that the affidavit implied that Defendant was present inside the Residence when SWAT arrived, when in fact he was only observed on the front porch, which was at night and in the winter.[12] (*Id.*) Defendant argues that these incorrect statements were material to the state magistrate judge's probable cause determination because: (1) running implies flight and consciousness of guilt and (2) presence inside the Residence implies proximity to and control over the narcotics and other contraband discovered in it. (ECF No. 40, at 12–16.) Defendant posits that these are knowing, intentional, or reckless false statements that were material to the magistrate judge's probable cause determination. His syllogism follows thusly: Det. Berberich wrote the affidavit containing these false statements that accompanied the warrant application. (ECF No. 40-1, at 1.) Det. Berberich was not able to see the Defendant when SWAT initially arrived and Det. Berberich's account is based on the observations of SWAT Operator Mescan. (Tr. at 58:19–21, 59:1–4.) Mescan testified that he only saw Defendant walking from the Residence and "coming off the porch." (H.T. 7/21/17, at 40.) Mescan also testified that he never told his commander that he saw the Defendant running from the Residence. (*Id.* at 39–40.) Therefore, Det. Berberich's statements in the affidavit are at least recklessly false. The Defendant then argues that if these

---

[11] SWAT Operator Mescan, the eyewitness Det. Berberich relied upon for his affidavit, testified in state court that Defendant was observed walking, not running, when SWAT arrived. (H.T. 7/21/17, at 23–24, 30.)

[12] For instance, the affidavit stated Mescan saw the Defendant "run *out of the house* via the front screen door," which is inconsistent with Mescan's state-court testimony. (*See generally* H.T. 7/21/17, at 40.)

-24-

statements are excised, a magistrate judge could not have found probable cause. Therefore, these are material, false statements that were knowing, intentional, or demonstrating reckless disregard for the truth.[13]

The Court concludes that Defendant has not made a substantial preliminary showing that these purportedly false statements were made knowingly or with reckless disregard for the truth, or were necessary to a probable cause finding. *See Franks*, 438 U.S. at 155–56. Defendant was observed by Mescan on the porch of the Residence, and to be leaving it when SWAT arrived. (H.T. 7/21/19, at 30, 40.) Mescan observed him walking, not running, off the porch. (*Id.* at 23–24.) Mescan testified that his initial observations were "relayed to other team members. (*Id.* at 23.) Det. Berberich heard Mescan's relay over the police radio. (Tr. at 69:12–18.) Det. Berberich recalls hearing that an individual was seen fleeing out of the Residence. (*Id.* at 69:16–18.) Before writing a police report on the events of that day, Det. Berberich did not debrief with Mescan afterwards to discuss exactly what Mescan observed. (*Id.* at 69:19–25.) While there are inconsistencies between the affidavit and the accounts of Det. Berberich and SWAT Operator Mescan, Defendant has not made a showing that Det. Berberich's statements in the affidavit were more than mere negligence or innocent mistake. *See Franks*, 438 U.S. at 171. While the inference that Det. Berberich purposefully or recklessly embellished his affidavit could be theoretically plausible, it is not substantially shown by the evidence presented because, in the Court's view, it is far more likely that the claimed inconsistencies were due to Det. Berberich relying on the radio transmission and then not following up.

---

[13] At oral argument, Defendant's counsel also argued that Defendant's alleged gang affiliation, which is mentioned in the warrant, should be excised pursuant to *Franks* because it was based on stale information. (Tr. at 113:19–114:14.) However, the Court concludes that this allegation has not been shown to be false, much less recklessly or deliberately false. Det. Berberich testified that he had various sources of information to form the belief that Defendant was a member of the Hazelwood Mob and that he never received any information to suggest the Defendant had withdrawn from that gang. (Tr. 38:1–5, 41:3–11, 43:1–10, 70:19–24.)

-25-

Furthermore, Defendant has not shown that, in any event, these statements were material to a finding of probable cause. The Court concludes that the remaining averments in the affidavit were sufficient to find probable cause to search the Defendant's cell phones. The key assertions are: (1) substantial quantities of narcotics, paraphernalia, currency, and a firearm were recovered from the Residence; (2) Defendant was present at least on the porch of the property when SWAT arrived; (3) Defendant was observed coming and going from the Residence on a daily basis; (4) the keys found on the Defendant's person were able to unlock the door to the Residence; (5) the owner of the Residence was the Defendant's mother; (6) the two (2) cell phones at issue were found on the Defendant's person; and (7) Det. Berberich's combined training, education, and experience allowed him to recognize that cell phones are often used in furtherance of drug crimes. (ECF No. 40-1, at 2–3.) And, Defendant was seen coming off of the porch of the Residence, at night, in the winter, creating an additional strong inference that he had just come out of the Residence, the same Residence that Det. Berberich had seen him repeatedly coming in and out of in the summer and fall. (*Id.* at 2; Tr. at 63:20–64:5.) The Court concludes that the state magistrate judge had a sufficient basis to find probable cause to search the cell phones on these bases, notwithstanding the averred inaccuracies. Even if they are excised, there was sufficient indicia of probable cause to issue the warrant for the cell phones.

Defendant also argues that the affidavit omitted two key things. First, the affidavit omits the fact that, among the listed items found in the Residence, "[i]ndicia (upstairs from bedroom)" did not include any direct evidence that Defendant resided at the Residence. Instead, he says that it implies through omission that police found evidence of the Defendant's access to, residence in, or control of the Residence. Defendant argues, and the Court agrees, that the indicia recovered did

-26-

not directly demonstrate the Defendant's residence, access, or control of or at the Residence.[14] Second, the affidavit omitted that the indicia actually demonstrated that Whitney Fennell, who was found near the Residence, was briefly detained, questioned, and released, may have resided at the Residence. Defendant argues these omissions are material to a probable cause determination because any reasonable judge would want to know these added details, as they communicate "who had access to or resided in the residence" and the affidavit paints Defendant "as the only possessor of the house." (ECF No. 40, at 18–19.)

The Court finds these arguments unconvincing. First, any alleged inferential omission with respect to the mention of "indicia" was cured by Det. Berberich's clarification later in the affidavit, where he writes "[o]fficers observed hundreds of pieces of indicia inside of this residence for Tanya Johnson." (ECF No. 40-1, at 3.) Second, while the affidavit does omit the specific fact that indicia of Whitney Fennell was found at the Residence, this does not rise to the level of information a reasonable person would believe a judge would wish to know. *See Wilson*, 212 F.3d at 788. Evidence that another person might also reside at the same location in which Defendant was arrested does not negate the evidence set out above that the Defendant was himself significantly associated with the Residence, including the housekey in his pocket and Det. Berberich's observations of his comings and goings at the Residence. Further, the affidavit did not purport to paint the Defendant as the sole possessor of the Residence, as Defendant suggests. (ECF No. 40, at 18–19.) Rather, it asserted he was the sole possessor "at [the] time" due to the fact he was the only one present on the property. (ECF No. 40-1, at 2.) In fact, the affidavit readily stated that the Residence was owned by the Defendant's mother and disclosed the presence of Whitney Fennell in the back alley of the Residence when the police executed the warrant. *Id.* Thus, the Court

---

[14] The "indicia" included a letter addressed to the Defendant, but at a different address in Virginia, as well as letters addressed to others, including Whitney Fennell. (*See* ECF No. 40-3.)

concludes that the affidavit contained no material omissions, even when viewed through the lens Defendant advances. *See Wilson*, 212 F.3d at 783.

### 2. *Sufficiency of the Warrants*

For the preceding reasons, the Court concludes that the state magistrate judge had a sufficient basis for the finding of probable cause. However, the Defendant also argues that the warrant application was deficient because it failed to establish a sufficient nexus between the alleged crime and the use of the Defendant's cell phones. In addressing this argument, the Court remains mindful that its review of the magistrate judge's determination must be highly deferential. *See Gates*, 462 U.S. at 238–39.

Defendant argues that the affidavit cannot support a finding of probable cause to search the cell phones because it does not provide any information suggesting the cell phones were actually involved in any crime. Rather, the affidavit relies upon the statement of Det. Berberich that "cell phones are often used in furtherance of street level narcotics transactions" and that "cell phones have become a crucial tool in the drug trade . . . commonly used by both narcotics sellers as well as narcotics users for the purposes of arranging narcotics transactions." (ECF No. 40-1, at 2.) To make this argument, Defendant cites to *United States v. Gorny*, No. 13-70, 2014 WL 2860637 (W.D. Pa. 2014), and *United States v. Cruz*, No. 14-70, 2015 WL 5514816 (W.D. Pa 2015). In both cases, the court affirmed the magistrate judges' probable cause determinations. However, in those cases, unlike here, the affiants specifically attested that the cell phones at issue were used by defendants in relation to their offenses. *Gorny*, 2014 WL 2860637 at *8 ("[T]he detectives were aware that Gorny used cell phones to conduct drug deals"); *Cruz*, 2015 WL 5514816 at *5 (rejecting a challenge to the search warrant in part because of certain text messages attested to by affiants). The Government does not dispute that the affidavit here lacks such direct statements that

Defendant's cell phones were used in alleged drug trafficking crimes. However, the Government counters that such a requirement "provides a much higher burden than required." (ECF No. 46, at 13.) The Court agrees, at least in the situation presented here.

In *United States v. Brewer*, the court concluded that the magistrate judge had a substantial basis to find probable cause to search the defendant's cell phone despite the lack of a direct "nexus" between the alleged crime (robbery) and the cell phone. No. 13-13-03, 2015 WL 2250150 at *4 (M.D. Pa. May 12, 2015), *aff'd*, 708 F. App'x 96 (3d Cir. 2017). The court concluded that the magistrate judge's determination was reasonable in light of other evidence in the warrant affidavit connecting the defendant to a robbery and the fact that the defendant claimed ownership of the cell phone. *Id.* The Third Circuit affirmed. *See United States v. Brewer*, 708 F. App'x at 99–100.

The Defendant in this case makes a similar "nexus" argument. However, the affidavit in this case demonstrated sufficient evidence linking Defendant to the underlying offense and possession of the cell phones. As the Court has already discussed, the cell phone warrant affidavit contained ample evidence to link Defendant to the alleged crime.[15] In addition, the affidavit provides a sufficient basis to conclude that the cell phones belonged to the Defendant.[16] Accordingly, as in *Brewer*, Defendant's possession of the cell phones is sufficient to create a nexus between the charged crimes and the cell phones. *Brewer*, 2015 WL 2250150 at *4. In conjunction with Det. Berberich's stated experience that cell phones are often used in narcotics crimes, the Court concludes that the issuing judge had a substantial basis to conclude that evidence of the alleged crimes would be discovered on the cell phones, fulfilling the probable cause requirement.

---

[15] This evidence includes Det. Berberich's observations of Defendant's comings and goings to and from the Residence, the Defendant's presence at the Residence when the search warrant was executed, evidence of narcotics trafficking and firearms in the Residence, the key to the Residence in the Defendant's pocket, and Defendant's alleged gang membership. (ECF No. 40-1, at 2–3.)

[16] The cell phones were recovered from the Defendant's person at the time of arrest. (ECF No. 40-1, at 3.)

### 3. The Good Faith Exception

Even if the warrant affidavit provided an insufficient basis to find probable cause, the good faith exception will preclude suppression.

Defendant argues that the good faith exception does not apply because the state magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit. *See Zimmerman*, 277 F.3d at 436. However, the Court has already concluded that the state cell phone warrant affidavit did not include material, deliberate or recklessly false statements or omissions. And, because the "deliberately or recklessly false affidavit" exclusion to the good faith exception does not apply, the remaining inquiry is whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate judge's authorization. *Id.* The Court concludes that the various indicia of probable cause in the state cell phone warrant affidavit would not lead a reasonable officer to conclude that the search was illegal despite the issuance of a search warrant. Therefore, the warrant was facially valid and the search was executed "in objectively reasonable reliance on [the] warrant's authority." *Id.*

### D. Motion to Suppress Evidence—Cellular Phones (Federal Search Warrant) (ECF No. 39)

Defendant also challenges the federal warrants issued to search the cell phones. Defendant's motion presents a nearly identical argument to his motion to suppress evidence gathered pursuant to the state search warrant. Defendant argues the federal warrant affidavits similarly included deliberate or reckless false, material statements and omissions. He also argues that the affidavits failed to demonstrate a sufficient nexus between the cell phones and the alleged crimes. In this case, these affidavits were authored by ATF Special Agent James Fidler.

The averments at issue in Agent Fidler's affidavits are substantially similar to the challenged language in Det. Berberich's affidavit. The federal affidavits stated that Defendant was observed attempting to "flee from the front door" of the Residence when SWAT announced their presence. (ECF No. 46-5, at 5; ECF No. 46-6, at 4.) As with the state warrant, Defendant argues that this was a deliberate or reckless false statement, which communicated consciousness of guilt. The federal affidavits also stated that Defendant was observed by PBP conducting a hand-to-hand drug transaction "from the residence" and that the Defendant "was at the residence at the time" SWAT executed the search warrant for the Residence. *Id.* Defendant again argues that this was a deliberate or reckless false statement because the evidence demonstrates that Defendant was never observed *inside* the Residence, yet the affidavit language would communicate to a reasonable person that Defendant was inside the Residence. Defendant also argues that the affidavit recklessly omits that no indicia of the Defendant's habitation of the Residence was recovered, as well as the fact that indicia of Whitney Fennell's residence was recovered.

Agent Fidler's affidavits were premised "primarily on discussions with other law enforcement agents, review of documents and records, and [his] personal knowledge, observations, experience, and training." (ECF No. 46-5, at 3; ECF No. 46-6, at 3.) In addition to presenting evidence similar to that in the state warrant, Agent Fidler included a brief recounting of the hand-to-hand drug sale between the Defendant and Mitchell that Det. Berberich witnessed on December 30, 2016, as well as an extensive explication of evidence commonly stored on cell phones associated with narcotics crimes. (ECF No. 46-5, at 6–9; ECF No. 46-6, at 4–12.)

For the same reasons the Court denied Defendant's state warrant suppression motion, the Court also concludes the federal warrants are valid and no *Franks* hearing is warranted. While the affidavit does not specify the exact sources, the challenged statements in Agent Fidler's affidavits

-31-

are plainly based on reports and discussions with PBP given how closely they mirror the state affidavit. Having already concluded that Det. Berberich did not make any deliberate or reckless false statements or omissions in his affidavits that were material, and given that Defendant provides no evidence that Agent Fidler's affidavits were based on any other potential deliberate or reckless false statements, the Court concludes that Defendant has not made a substantial preliminary showing to justify a *Franks* hearing. The Defendant's presence *in front* of the Residence during the hand-to-hand narcotics transaction and his presence *on the porch* of the Residence, as well as the lack of flight when the police arrived to execute the search warrant, are not enough to dispel the Defendant's connections to the Residence, the alleged crime, and the probable cause to search the cell phones. Even if these statements are excised, there was a sufficient factual basis for the Magistrate Judge to find probable cause. The affidavit nevertheless recounted: (1) the hand-to-hand drug deal between the Defendant and Mitchell in proximity to the Residence; (2) the Defendant's presence at the Residence when the police executed the search warrant; (3) the extensive evidence of drug dealing, firearms, and other contraband discovered in the Residence; (4) the recovery of the cell phones; and (5) an explanation that evidence of narcotics and firearms would likely be recovered from the cell phones. (ECF No. 46-5, at 6–9; ECF No. 46-6, at 4–12.)

The Court therefore also concludes that the warrant affidavits provided a substantial basis for the magistrate judge to conclude that evidence would be recovered from the Defendant's cell phones. They recount the hand-to-hand sale, the Defendant's presence at the Residence when the warrant was executed, the contraband discovered in the Residence, the recovery of the cell phones during the search, and a considerable exposition on the likelihood that evidence of narcotics and firearms would be recovered from the cell phones, based on Agent Fidler's training and experience. (ECF No. 46-5, at 6–9; ECF No. 46-6, at 4–12.)

But even if the warrant affidavits provided an insufficient basis to find probable cause, the good faith exception again precludes suppression. Defendant argues that the good faith exception does not apply to the federal warrants because the magistrate judge relied on a deliberately or recklessly false affidavit. The Court has already concluded that the state warrant affidavit did not contain deliberate or reckless false statements or omissions that were material, which would have been passed along to Agent Fidler. Therefore, this exclusion from the good faith exception does not apply and the warrant was otherwise facially valid. Thus, the search was executed "in objectively reasonable reliance on [the] warrant's authority" and the good faith exception would prevent suppression. *Zimmerman*, 277 F.3d at 436.

## III.    CONCLUSION

The concept of probable cause is a fluid one, "turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232. The task of this Court is to determine whether the magistrate judge had a substantial basis to conclude a search of the Residence and cell phones would uncover evidence of wrongdoing. *Id.* at 236. Accordingly, the Court concludes that for each challenged warrant, the issuing judge had a substantial basis to conclude that there was probable cause to issue the warrant, and the resulting evidence will not be suppressed. Further, the Court concludes that the good faith exception would apply to these searches and prevent suppression of the evidence. The searches of the Residence and the cell phones were authorized by a judicial warrant and, based on the record, the Court concludes that the law enforcement officers reasonably relied on the respective warrants' authority in carrying out the involved searches. The Defendant has also not made the substantial preliminary showing to necessitate a *Franks* hearing for either the state or federal cell phone warrants. For the foregoing reasons, Defendant's Motion to Suppress Evidence—Cellular Phones

(Federal Search Warrant), ECF No. 39; Motion to Suppress Evidence—Cellular Phones (State Search Warrant), ECF No. 40; and Motion to Suppress Evidence (Search of Renova Street), ECF No. 41, are each DENIED. With respect to Defendant's search incident to arrest, the Court concludes that there were sufficient facts and circumstances for Det. Berberich to conclude at the time of arrest that Defendant had committed a crime. For the foregoing reasons, Defendant's Motion to Suppress Evidence Stemming from Arrest, ECF No. 42, is also DENIED. The Defendant's remaining Motions at ECF Nos. 36, 37, and 48 will be addressed in the Court's Pretrial Order.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: October 18, 2019

cc:    All counsel of record